# EXHIBIT B

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

March 10, 2023

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CLEVELAND INTEGRITY SERVICES INC., *et al.*,[1] | ) | Case No. 23-90052 (CML) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## ORDER (I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (the "**Debtors**") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order (this "**Sale Order**") (a) authorizing and approving the Asset Purchase Agreement, dated as of January 29, 2023, between the Debtors, as sellers (the "**Sellers**," and each a "**Seller**") and CIS Purchaser, LLC, as purchaser (together with its permitted designees or assignees under the APA, the "**Purchaser**"), a copy of which is attached hereto as **Exhibit 3** (the "**APA**"), (b) authorizing and approving the sale of substantially all of the Debtors' assets (the "**Purchased Assets**") to the Purchaser pursuant to the APA (the "**Sale**") free and clear of all claims, liens, interests, and encumbrances, (c) authorizing and approving the assumption and assignment of the Assigned Contacts to the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: CIS Treasury, LLC (8509) and Cleveland Integrity Services Inc. (9258). The Debtors' service address is: 370690 East Old Highway 64, Cleveland, Oklahoma 74020.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the APA, or to the extent not defined therein, the Bidding Procedures Order (defined herein).

Purchaser, and (d) granting related relief; and the Court having conducted a hearing on February 6, 2023, and having entered that certain *Order (A) Approving Bidding Procedures and Designating a Stalking Horse Bidder, (B) Scheduling a Bid Deadline, Auction Date, and Sale Hearing and Approving the Form and Manner of Notice Thereof, and (C) Approving Cure Procedures and the Form and Manner of Notice Thereof* [Docket No. 69] (the "**Bidding Procedures Order**"); and the Debtors having determined that the highest and otherwise best offer for the Purchased Assets was made by the Purchaser pursuant to the APA; and the Court having conducted a hearing on March 10, 2023, (the "**Sale Hearing**"), at which time all parties in interest were offered an opportunity to be heard with respect to the Sale and to consider the approval of the Sale pursuant to the terms and conditions of the APA, and the Court having considered: (i) the *Declaration of Matt Kesner, President and Chief Operating Officer of Cleveland Integrity Services, Inc. in Support of the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Interests* [Docket No. 146], the *Declaration of Sanjiv Shah in Support of the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Interests* [Docket No. 147], and the *Declaration of Brian Finkelstein in Support of Sale* [Docket No. 148], (ii) the Motion and any objections thereto, (iii) the Sale, (iv) the arguments of counsel made, and evidence adduced, related thereto, and (v) the record of the Sale Hearing held before the Court; all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the APA and the Sale and other transactions contemplated by the APA; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; it is hereby **FOUND, CONCLUDED, AND DETERMINED THAT**:[3]

---

[3] All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

020467.4892-9950-0366

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these Chapter 11 Cases pursuant to Bankruptcy Rule 9014.

B.      To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      This Court has jurisdiction over the Motion and over the property of the Debtors, including the Purchased Assets to be sold, transferred, and conveyed pursuant to the APA, pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these Chapter 11 Cases and the Motion in this District and Court is proper under 28 U.S.C. §§ 1408 and 1409.

D.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court finds that there is no just reason for delay in the implementation of this Sale Order and directs entry of judgment as set forth herein.

E.      The Debtors' rights, title and interest in the Purchased Assets constitute property of the Sellers' bankruptcy estates and title thereto is vested in the Sellers' bankruptcy estates within the meaning of section 541(a) of the Bankruptcy Code.

F.      The statutory bases for the relief requested in the Motion and provided for herein are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

G.     On January 29, 2023 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code, commencing these Chapter 11 Cases.  Since the Petition Date, the Debtors have continued to operate their businesses and manage their property and corresponding business as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

H.     This Court previously entered the Bidding Procedures Order: (i) establishing bidding and auction procedures in connection with one or more sales or dispositions of all or substantially all of the Debtors' assets; (ii) authorizing and approving the Debtors' entry into and performance under the APA, subject to better offers submitted in accordance with the Bidding Procedures, naming the Purchaser as the Stalking Horse Bidder; (iii) scheduling the Auction (if necessary) and the Sale Hearing to consider the sale of all or substantially all of the Debtors' assets, to the extent set forth in the Bidding Procedures Order; (iv) establishing procedures for noticing and determining cure amounts related to and the assumption and assignment of Seller's executory contracts and unexpired leases; (v) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (vi) granting certain related relief.

I.     As evidenced by the affidavits or certificates of service and publication previously filed with the Court,[4] demonstrated by the evidence presented at, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Sale, and the assumption and assignment pursuant to this Sale Order and the APA of the executory contracts and unexpired leases to be assumed and assigned to the Purchaser at Closing (collectively, and whether or not deemed to be executory contracts or unexpired leases under the APA, and only as so designated in the Purchaser's sole discretion, the "**Assigned**

---

[4] Docket Nos. 77, 87, 88, 121, 122, and 155.

**Contracts**") has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and in compliance with the Bidding Procedures Order, to each party entitled to such notice, including, as applicable: (1) all persons known or reasonably believed by the Debtors to have expressed an interest in acquiring all or a substantial portion of the assets of the Debtors; (2) any other persons identified by the Debtors or their advisors as being potentially interested in acquiring all or a substantial portion of the assets of the Debtors: (3) counsel to the Prepetition Secured Parties, the DIP Secured Parties and the Purchaser; (4) the U.S. Trustee; (5) all counterparties to the Assigned Contracts; (6) all parties known by the Debtors to assert a lien on any of the Purchased Assets; (7) all persons known or reasonably believed, after reasonable inquiry, to have asserted a lien, encumbrance, claim, or any other interest in any of the Purchased Assets; (8) any taxing authorities with jurisdiction over the Purchased Assets, including the Internal Revenue Service; and (9) all parties set forth in the Debtors' master service list and creditor matrix in these Chapter 11 Cases, which lists include (i) parties that had filed a notice of appearance and demand for service of papers in these Chapter 11 Cases; (ii) holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (iii) the Office of the United States Attorney for the Southern District of Texas; (iv) the Office of the Attorney General in each state in which the Debtors operate; (v) any interest holders in the Debtors; and (vi) all known creditors and parties in interest as of the entry of the Bidding Procedures Order. With respect to entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice once in the *Wall Street Journal* on February 13, 2023 and once in the *Tulsa World* on February 14, 2023, as evidenced by the affidavits of publication filed by the Debtors at Docket Nos. 121 and 122 in these Chapter 11 Cases, was, and is deemed, sufficient and reasonably calculated under the circumstances to reach such entities.

The notice described above, and in the Motion and Bidding Procedures Order, was good, sufficient, and appropriate under the circumstances, and reasonably calculated to reach and apprise all known and unknown holders of liens, claims, and encumbrances, and no other or further notice of the Motion, the Sale, the Sale Hearing, the potential assumption and assignment of the Assigned Contracts or the related Cure Amounts (as defined below) is, or shall be, required.

J.    The Sale Notice provided all interested parties with timely and proper notice of the Sale, Bid Deadline, Sale Objection Deadline, Cure Objection Deadline, Adequate Assurance Objection Deadline, and Sale Hearing.  Further, a reasonable opportunity to object to and to be heard regarding the relief granted by this Sale Order has been afforded to parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

K.    In accordance with the Bidding Procedures Order, the Debtors have served upon each non-Debtor Counterparty to a contract or lease a notice (as amended, modified, or otherwise supplemented from time to time, the "**Cure Notice**") of the potential assumption and assignment of the contract or lease and of the amounts necessary to cure any defaults under the Proposed Assigned Contracts (the "**Cure Amounts**") pursuant to section 365(b) of the Bankruptcy Code.

L.    The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion and provided for herein.

M.    The disclosures made by the Debtors at (i) the Sale Hearing and the hearing on the Bidding Procedures, and (ii) in the Motion, the Sale Notice, and related documents filed with the Court concerning the APA, the Sale and the Sale Hearing were good, complete and adequate.

N.    The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive, proposed and executed in good faith as a result of arms'-length negotiations, and were substantively and procedurally fair to all parties.

020467.4892-9950-0366

O.      The Debtors conducted the sale process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order.  The sale process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Purchased Assets.

P.      The terms contained in the APA constitute the highest and best offer for the Purchased Assets and will provide a greater recovery for the Purchased Assets than would be provided by any other available alternative.  The Debtors' determination that the APA constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of Debtors' business judgment.

Q.      The APA and the Sale contemplated thereby represent a fair and reasonable agreement to purchase the Purchased Assets under the circumstances of these Chapter 11 Cases. No other entity or group of entities has presented a higher or otherwise better offer to the Debtors to purchase the Purchased Assets for greater economic value to the Debtors' estates than the Purchaser.

R.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale of the Purchased Assets because, among other reasons: (i) the APA constitutes the highest and best offer for the Purchased Assets; (ii) the APA and the closing thereon will present the best opportunity to realize the value of the Purchased Assets; and (iii) any other transaction would not have yielded as favorable an economic result.

S.      The Purchaser is purchasing the Purchased Assets in good faith and is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and, therefore, is entitled to the full protections of that provision, including in the event that this Sale Order or any portion hereof is reversed or modified on appeal; and otherwise has proceeded in good faith in all respects

7

in connection with the sale of the Purchased Assets in that (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (ii) the Purchaser complied with the provisions of the Bidding Procedures Order in all respects; (iii) the Purchaser agreed to subject its bid to the competitive Bidding Procedures set forth in the Bidding Procedures Order, including the Auction; (iv) all payments and other consideration to be made or otherwise provided by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed; (v) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (vi) the negotiation and execution of the APA, including the Sale contemplated thereby, were at arms'-length and in good faith.

T.      The APA and the transactions contemplated thereby cannot be avoided under section 363(n) of the Bankruptcy Code.  The Debtors, the Purchaser, and the Purchaser's agents, representatives, and affiliates have not engaged in any conduct that would cause or permit the APA or the consummation of the transactions contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.  The Debtors and their professionals marketed the Purchased Assets and conducted the marketing and sale process in substantial compliance with the Bidding Procedures Order.

U.      The Purchaser participated in the sale process in good faith and has not acted in a collusive manner with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets.

V.      Pursuant to the APA and as more fully set forth therein, the Purchaser has offered to purchase the Purchased Assets in exchange for (i) a credit bid, on a dollar-for-dollar basis, pursuant to section 363(k) of the Bankruptcy Code, in an aggregate amount of $30,000,000 in

8

principal obligations owing by the Sellers as of the Closing under the DIP Facility, plus all unpaid principal, interest, fees, and costs (collectively, the "**Credit Bid Amount**"); (ii) payment of Cure Costs (subject to the Cure Costs Cap); (iii) assumption of the Assumed Liabilities (subject to the limitations set forth in the APA); and (iv) cash equal to the amount of Accrued Payroll on the terms set forth more fully in Section 4.1 of the APA. The Debtors selected the Purchaser to serve as the "Stalking Horse Bidder" under their proposed bidding procedures, which were approved by the Court pursuant to the Bidding Procedures Order. The Purchaser is an acquisition entity formed by Owl Rock Capital Corporation in its capacity as DIP Agent and Prepetition Agent (each as defined in the DIP Orders).

W. The Purchaser had submitted its bid, and no Qualified Bids other than the Purchaser's bid were received by the Bid Deadline of March 1, 2023, at 4:00 p.m. Central Time. The Debtors filed the *Notice of Cancellation of Auction* [Docket No. 141] on March 2, 2023. The Debtors determined, in a valid and sound exercise of their business judgment, that the transactions contemplated by the APA represented the highest or otherwise best bid. Therefore, the Purchaser's bid was designated as the Successful Bid, and the Debtors filed the *Notice of (I) Designation of CIS Purchaser, LLC as Successful Bidder, Including (A) the Proposed Form of Asset Purchase Agreement and (B) the List of Assumed Executory Contracts and Unexpired Leases; and (II) the Proposed Form of Sale Order* [Docket No. 143] on March 7, 2023. As established by the record of the Sale Hearing, the Debtors and the Purchaser have complied in all material respects with Bid Procedures Order. The Bidding Procedures afforded a full, fair, and reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the Purchased Assets.

X. As set forth more fully in the DIP Orders, the Debtors have acknowledged that the Prepetition Obligations (as defined in the DIP Orders): (a) constitute legal, valid, binding,

enforceable, unavoidable obligations of the Debtors, which are not subject to any Challenge (as defined in the DIP Orders); (b) are secured by valid, binding, enforceable, unavoidable and properly perfected Prepetition Liens on the Prepetition Collateral (each as defined in the DIP Orders), which are not subject to any Challenge (as defined in the DIP Orders); (c) constitute allowed secured claims under Section 502(a) of the Bankruptcy Code; and (d) are authorized to be credit bid pursuant to Section 363(k) of the Bankruptcy Code.

Y.      As set forth more fully in the DIP Orders, the DIP Obligations (as defined in the DIP Orders): (a) constitute legal, valid, binding, enforceable, unavoidable obligations of the Debtors; (b) are secured by valid, binding, enforceable, unavoidable and properly perfected DIP Liens on the DIP Collateral (each as defined in the DIP Orders); and (c) are authorized to be credit bid pursuant to Section 363(k) of the Bankruptcy Code.  The DIP Obligations shall be contributed by the DIP Lenders (as defined in the DIP Orders) to the Purchaser (or one of its direct or indirect affiliates) in connection with the sale transaction contemplated under the APA.

Z.      Pursuant to applicable law, including section 363(k) of the Bankruptcy Code and in accordance with the DIP Orders, the Purchaser is authorized to credit bid the Credit Bid Amount as contemplated under the APA.  The Credit Bid Amount is valid and proper consideration pursuant to sections 363(b) and 363(k) of the Bankruptcy Code and the DIP Orders.

AA.      The consideration provided by the Purchaser pursuant to the APA: (i) is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession thereof, or the District of Columbia (including the Uniform Fraudulent Transfer Act); (ii) is fair consideration under the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, the Bankruptcy Code, and any other applicable laws; and (iii) will provide a greater recovery for the Debtors' estates and

their creditors than would be provided by any other reasonably practicable available alternative. The APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under any other applicable law. Neither the Debtors nor the Purchaser have entered into the APA or are consummating the Sale with any fraudulent intent or otherwise improper purpose prohibited by law.

BB.     By consummating the Sale, the Purchaser is not a mere continuation of any or all of the Debtors or their estates, and there is no continuity, no common identity, and no continuity of enterprise between the Purchaser and the Debtors. The Purchaser is not holding itself out to the public as a continuation of any or all of the Debtors. The Purchaser is not a successor to the Debtors or the Debtors' estates by reason of any theory of law or equity, and the Sale does not amount to a consolidation, merger, or *de facto* merger of Purchaser or the Debtors. The Purchaser will not assume or in any way be responsible for any obligation or liability of the Debtors and/or the Debtors' estates except as expressly provided in this Sale Order or the APA.

CC.     The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating or plan of reorganization of the Debtors. This Sale Order does not constitute a *sub rosa* plan.

DD.     The Debtors, acting by and through their existing agents, representatives, and officers, have full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and the Debtors require no further consents or approvals to consummate the Sale contemplated by the APA, except as otherwise set forth in the APA.

EE.     The transfer of each of the Purchased Assets to the Purchaser will be as of the Closing Date a legal, valid, and effective transfer of such assets, and vests or will vest the Purchaser

with all right, title, and interest of Sellers to the Purchased Assets free and clear of all Interests or Claims (as defined below) accruing, arising or relating thereto any time prior to the Closing Date, unless otherwise assumed in, or transferred by, the APA.

FF.     The Debtors may sell the Purchased Assets free and clear of all Interests or Claims against the Debtors, their bankruptcy estates, or any of the Purchased Assets (unless otherwise assumed in, or transferred by, the APA) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied.  Each Interest or Claim (other than an Assumed Liability) that is attached to the Purchased Assets to be transferred on the Closing Date: (i) is subject to release or discharge under applicable non-bankruptcy law, (ii) is held by an entity that has consented to the Sale or is deemed to have consented to the Sale; (iii) constitutes a lien against some or all of the Purchased Assets and the price at which such property is to be sold under the APA is greater than the aggregate value of all liens on such property, (iv) is the subject of a bona fide dispute, or (v) is held by an entity that could be compelled in a legal or equitable proceeding to accept money satisfaction of such encumbrance.

GG.     Those holders of Interests or Claims against the Debtors, their bankruptcy estates, or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Interests or Claims who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.  Specifically, all holders of Interests or Claims (other than the Assumed Liabilities) are adequately protected by having their Interests or Claims, if any, in each instance against the Sellers, their bankruptcy estates, or any of the Purchased Assets, attach to the net cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority with the

12

same validity, force, and effect that such creditor had prior to the Sale, subject to any rights, claims, and defenses the Debtors or their estates may possess with respect thereto.

HH.    If, except as otherwise assumed in, or permitted by, the APA, the Sale were not free and clear of all Interests or Claims, or if the Purchaser would, or in the future could, be liable for any of the Interests or Claims, the Purchaser would not have entered into the APA and would not consummate the Sale, thus adversely affecting the Debtors and their bankruptcy estates and creditors.

II.    The Debtors have demonstrated that it is an exercise of their sound business judgment for the Debtors to assume and assign the Assigned Contracts to the Purchaser pursuant to the terms of this Sale Order and the APA, in each case in connection with the consummation of the Sale, and the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their bankruptcy estates and creditors, and other parties in interest. The Assigned Contracts being assigned to the Purchaser under the APA are an integral part of the APA and the Sale and, accordingly, such assumptions and assignments are reasonable and enhance the value of the Debtors' bankruptcy estates. Any non-Debtor counterparty to any Assigned Contract that has not actually filed with the Court an objection to such assumption as of the date hereof is deemed to have consented to such assumption and assignment.

JJ.    The Debtors and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), 365(b)(1)(B), 365(b)(1)(C), and 365(f) of the Bankruptcy Code, in connection with the sale and assumption and assignment of the Assigned Contracts to the extent provided under this Sale Order and the APA and have: (i) cured any default existing prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code; and (ii)

13

provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance with respect to the Assigned Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. The Assigned Contracts are assignable notwithstanding any provisions contained therein to the contrary.

KK.     The APA and Sale must be approved, and the Closing must occur promptly to preserve the value of the Purchased Assets and maximize value for the Debtors' bankruptcy estates.

LL.     Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the consideration provided by the Purchaser under the APA, the Sale constitutes a reasonable and sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their bankruptcy estates, creditors, and other parties in interest in these Chapter 11 Cases, and should be approved.

MM.   The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.

**<u>NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:</u>**

1.      The relief requested in the Motion, and the transactions contemplated thereby and by the APA, are APPROVED as set forth in this Sale Order and on the record of the Sale Hearing, which is incorporated herein as if fully set forth in this Sale Order, and the Sale contemplated by the APA is APPROVED.

2. Any and all objections and responses to the Motion that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby overruled and denied on the merits. Notice of the Motion, the Sale Hearing, and the Sale was fair and equitable under the circumstances, and complied in all respects with the Bidding Procedures Order and with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

## Approval of the Sale of the Purchased Assets

3. The APA, including all other ancillary documents, and all of the terms and conditions thereof, and the Sale contemplated thereby, including the Purchase Price and the Credit Bid Amount, are hereby approved in all respects.

4. Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, acting by and through their existing agents, representatives, and officers, are authorized and empowered to take any and all actions necessary or appropriate to: (a) consummate and close the Sale pursuant to and in accordance with the terms and conditions of this Sale Order and the APA; (b) transfer and assign all right, title, and interest to all Purchased Assets, including any and all property, licenses, and rights to be conveyed in accordance with the terms and conditions of this Sale Order and the APA; and (c) execute and deliver, perform under, consummate, and implement this Sale Order, the APA, the Transition Services Agreement, and all additional instruments and documents that may be reasonably necessary or desirable to implement this Sale Order, the APA and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by this Sale Order, the APA and any such other ancillary documents.

5. This Sale Order will be binding in all respects upon the Debtors, their bankruptcy estates, all creditors, all holders of equity interests in the Debtors, all holders of any Interests or Claims (whether known or unknown) against the Debtors, any and all alleged holders of Interests

15

or Claims against or on all or any portion of the Purchased Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code of any or all of the Debtors' cases.  The terms and provisions of the APA and this Sale Order will inure to the benefit of the Debtors, their bankruptcy estates, their creditors, the Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, and any other affected third parties, including all persons asserting any Interests or Claims in the Purchased Assets to be sold to the Purchaser pursuant to the APA, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise will be binding.

### Sale and Transfer of Purchased Assets

6.      Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, upon the Closing Date and pursuant to and except as otherwise set forth in the APA, the Debtors' rights, title and interests in and to the Purchased Assets will be transferred to the Purchaser free and clear of all encumbrances, claims, interests, and liens, including mortgages, restrictions, covenants, easements, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, options, deeds of trust, security interests, other interests, conditional sale or other title retention agreements, pledges, and other liens (including mechanics', materialman's, possessory and other consensual and non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first refusal, offsets, contracts, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration,

products liability, derivative and vicarious liability, transferee liability, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, or charges of any kind or nature, if any, against the Debtors or the Purchased Assets, including any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, including any pension liabilities, retiree medical benefit liabilities, liabilities arising under or related to the Internal Revenue Code, of the Debtors or any of the Debtors' predecessors or affiliates, claims, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (other than Assumed Liabilities and Permitted Liens) (collectively, the "**Interests or Claims**"), with all such Interests or Claims to attach to the net cash proceeds of the Sale in the order of their priority, with the same validity, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses that the Debtors and their bankruptcy estates may possess with respect thereto.

7.     On the Closing Date, this Sale Order will be construed and will constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in such Purchased Assets to the Purchaser pursuant to the terms and conditions set forth in this Sale Order and the APA.  For the avoidance of doubt, the Retained Assets, Retained Contracts, and Retained Liabilities set forth

in the APA are not included in the Purchased Assets and such Retained Assets, Retained Contracts, and Retained Liabilities shall remain property of the Debtors' estates.

8.     Subject to the terms and conditions of this Sale Order, the transfer of the Purchased Assets to the Purchaser pursuant to the APA and the consummation of the Sale and any related actions contemplated thereby do not require any consents other than as specifically provided for in the APA, constitute a legal, valid, and effective transfer of the Purchased Assets, and will vest the Purchaser with all of the Debtors' rights, title, and interests in and to the Purchased Assets as set forth in this Sale Order and the APA, as applicable, free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise assumed in, or transferred by, the APA).

9.     The Purchaser will be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of Sellers constituting Purchased Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date as provided by this Sale Order and the APA.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Purchased Assets sold, transferred, assigned, or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale.

10.     Upon consummation of the Sale, if any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or recorded real property interests, or filed any other documents or agreements evidencing Interests or Claims against or in the Purchased

Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all Interests or Claims that the person or entity has with respect to the Purchased Assets (unless otherwise assumed in, or transferred by, the APA), or otherwise, then: (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, will constitute conclusive evidence of the release of all Interests or Claims in the Purchased Assets of any kind or nature (except as otherwise assumed in, or transferred by, the APA); *provided that*, notwithstanding anything in this Sale Order or the APA to the contrary, the provisions of this Sale Order will be self-executing, and neither the Debtors nor Purchaser will be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.  For the avoidance of doubt, upon consummation of the Sale, the Purchaser is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Sale Order under section 363 of the Bankruptcy Code and the related provisions of the Bankruptcy Code.

11.     Except to the extent included in Assumed Liabilities, or to enforce the APA, all entities, including all lenders, debt security holders, equity security holders, governmental, tax, and regulatory authorities, parties to executory contracts and unexpired leases, customers, dealers and sale representatives, and trade or other creditors holding Interests or Claims of any kind or

nature whatsoever against or in the Debtors and their bankruptcy estates or the Purchased Assets arising under or out of, in connection with, or in any way relating to, the Purchased Assets or the transfer of the Purchased Assets to the Purchaser, hereby are forever barred and estopped, from asserting any Interests or Claims of any kind or nature whatsoever arising prior to the Closing against the Purchaser and its permitted successors, designees, and assigns, or property, or the Purchased Assets conveyed in accordance with the APA.

12.     As of and after the Closing Date: (a) each of the Debtors' creditors is hereby authorized to execute such documents and take all other actions as may be necessary to release its Interests or Claims in the Purchased Assets (if any) as such Interests or Claims may have been recorded or may otherwise exist; and (b) any Purchased Asset that may be subject to a statutory or mechanic's lien will be turned over and such liens will attach to the net cash proceeds of the Sale in the same priority they currently enjoy with respect to the Purchased Assets.

### Contracts to be Assumed and Assigned

13.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date, Sellers' assumption and assignment to the Purchaser, and Purchaser's assumption, on the terms set forth in this Sale Order and the APA of the Assigned Contracts, is hereby approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

14.     Sellers are hereby authorized in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to assume and assign to the Purchaser, effective upon the Closing Date, the Assigned Contracts free and clear of all Interests or Claims of any kind or nature whatsoever (except as otherwise assumed in, or transferred by, the APA) and execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

15.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser will be fully and irrevocably vested in all right, title, and interest of each Assigned Contract.

16.     The Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms pursuant to the APA, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

17.     Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, at the Closing, or as soon as reasonably practicable thereafter, Purchaser will pay to the respective counterparty the Cure Amounts, if any, relating to any Assigned Contract.

18.     The payment of the applicable Cure Amounts (if any) will effect a cure of any and all defaults existing as of the date that such executory contracts or unexpired leases are assumed and compensate for any actual pecuniary loss to such non-Debtor party resulting from such default.

19.     Upon the Closing, Purchaser will assume the Assigned Contracts, and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by Sellers of such Assigned Contracts will not be a default thereunder.  After the payment of the relevant Cure Amounts, neither the Debtors, their bankruptcy estates, nor the Purchaser will have any further liabilities to the non-Debtor counterparties to the Assigned Contracts, other than Purchaser's obligations under the Assigned Contracts that accrue or become due and payable on or after the date that such Assigned Contracts are assumed.

20.     Except as otherwise agreed in writing between the Debtors and the non-Debtor Counterparties to the Assigned Contracts, stated on the record of the Sale Hearing, or determined

020467.4892-9950-0366

by Court order, the Cure Amounts for the Assigned Contracts are hereby fixed at the amounts set forth on **Exhibit 1** attached to this Sale Order, and the non-Debtor parties to such Assigned Contracts are forever bound by such Cure Amounts and, upon payment of such Cure Amounts, if any, are hereby enjoined from taking any action against the Debtors and their bankruptcy estates, Purchaser and all agents, representatives, affiliates, and permitted successors and assigns of the Purchaser, or the Purchased Assets with respect to any claim for cure under any Assigned Contract.

21.     Any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract constitute unenforceable anti-assignment provisions that are void, and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of the Assigned Contracts have been satisfied.

22.     Any party having the right to consent to the assumption or assignment of any Assigned Contract that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

23.     Upon the Closing, the Purchaser will be deemed to be substituted for the applicable Seller as a party to the applicable Assigned Contracts and the Debtors and their estates will be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

020467.4892-9950-0366

24. The Purchaser has provided adequate assurance of future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

25. Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assigned Contracts are forever barred from raising or asserting against the Debtors and their estates or Purchaser any assignment fee, default, breach, claim, pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date that such Assigned Contracts are assumed or arising by reason of or in connection with the Closing.

26. Notwithstanding anything to the contrary in this Sale Order or the APA, nothing herein shall impair or expand the indemnification obligations in the following Assigned Contracts: (i) that certain Master Service Agreement (Number: MPC-17-MSA-011) between Midship Pipeline Company, LLC and Debtor Cleveland Integrity Services, Inc. ("CIS"); (ii) that certain Direct Agreement among Midship Pipeline Company, LLC, Société Générale and CIS; (iii) that certain Master Services and Materials Agreement (Number: CCCPL-20-MSA-012) between Cheniere Corpus Christi Pipeline, LP and CIS; (iv) that certain Master Services Agreement # 161729, by and between Kinder Morgan Contracting Services, LLC, Kinder Morgan Energy Partners, LP (together, "KM") and CIS, including the terms of that certain Settlement Agreement by and between KM and CIS dated July 27, 2022, and (v) that certain Master Staffing Services Agreement dated September 1, 2021 between CIS and Centurion Pipeline Company, LLC and related purchase orders, including PO-1008381, PO-1008738, and PO-1008678; including for any claims covered by the indemnification provisions of such Assigned Contracts asserted after entry

of this Sale Order related to events, occurrences, acts, or omissions occurring prior to the Closing Date.

## **Additional Provisions**

27.     The Debtors and the Purchaser hereby waive, and will be deemed to waive, any requirement of compliance with, and any claims related to non-compliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.

28.     Following the Closing, no holder of an Interest or Claim in or against the Debtors and their bankruptcy estates or the Purchased Assets will interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to such Interest or Claim or any actions that the Debtors and their bankruptcy estates may take in these Chapter 11 Cases or any successor case.

29.     The Debtors, including their officers and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the APA and this Sale Order.  The Debtors will be, and hereby are, authorized to take all such actions as may be necessary to effectuate the terms of this Sale Order and the relief granted pursuant to this Sale Order.  No consents or approvals, other than those expressly provided for in the APA or this Sale Order, are required for the Debtors to consummate the Sale.

30.     Absent the express written consent of the Purchaser, the Debtors shall not settle or otherwise resolve any existing or future litigation with any third party or any Governmental Authority other than any settlement pursuant to which (i) any liability thereunder will be a Retained Liability, (ii) no payment from the Purchaser is sought or required, and (iii) no restrictions are placed on or affecting the Purchased Assets or the operation of the business from and after the Closing Date.

31.     The consideration provided by the Purchaser to the Debtors pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and other applicable law within the meaning of section 544(b) of the Bankruptcy Code, under the laws of the United States, any state, territory, possession, or the District of Columbia.

32.     Except for the Purchase Price (including payment of the Cure Costs and Accrued Payroll, subject to the terms of the APA, and the assumptions of the Assumed Liabilities), the Purchaser shall not have any liability whatsoever for any obligation of the Debtors arising under or related to (i) any of the Purchased Assets, (ii) any contracts assumed and assigned to the Purchaser, including the Assigned Contracts, or (iii) the operation of the Debtors' businesses prior to closing the transactions contemplated by the APA.  Without limiting the generality of the foregoing, and except for the Assumed Liabilities, the Purchaser shall not be liable for any Claims or Interests against or in the Debtors, any of their predecessors or affiliates, or any of the Purchased Assets.  By virtue of the Sale, to the extent allowed by applicable law and except as otherwise set forth in this Sale Order, the Purchaser and its affiliates, designees, successors, and assigns shall not be deemed or considered to (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor to the Debtors, including a "successor employer" for purposes of the Internal Revenue Code of 1986, ERISA, or other applicable laws; (b) have any responsibility or liability for any obligations of the Debtors, or any affiliate of the Debtors, based on any theory of successor or similar theories of liability; (c) have, *de facto* or otherwise, merged with or into any of the Debtors; (d) be an alter ego or a mere continuation or substantial continuation of any of the Debtors (and there is no continuity of enterprise between the Purchaser and any Debtor), including within the meaning of any foreign, federal, state, or local revenue, pension, ERISA, tax,

labor, employment, environmental, or other law, rule, or regulation (including filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any of the Debtors or their respective estates.

33.    The Sale is undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale will not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts by the Purchaser, if any, and the sale free and clear of all Interests or Claims (unless otherwise assumed pursuant to, or transferred by, the APA)), unless such authorization and consummation of such Sale are duly stayed pending such appeal.  The Purchaser is an entity that has purchased the Purchased Assets in good faith, as contemplated in section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

34.    As a good-faith purchaser of the Purchased Assets, the Purchaser has not colluded with any of the other bidders, potential bidders, or any other parties interested in the Purchased Assets, and therefore the sale of the Purchased Assets may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

35.    Pursuant to section 4.1 of the APA, the Credit Bid Amount shall include the full amount of the DIP Obligations (as defined in the DIP Orders) outstanding as of the Closing Date, and thereupon the DIP Obligations shall be deemed fully and finally satisfied.

36.    Nothing in this Sale Order shall be deemed to limit, abridge, or otherwise modify the Prepetition Secured Parties' (as defined in the DIP Orders) rights, liens, and claims, including any adequate protection liens and claims against all of the Retained Assets remaining in the

Debtors' estates; *provided*, *however*, that such liens and claims shall be subject to payments to be made by the Debtors from Retained Assets pursuant to the DIP Orders or any other orders of the Bankruptcy Court, consistent with section 2.2 of the APA, including the Wind Down Amount, which shall be used strictly in accordance with the budget (the "Wind Down Budget") attached hereto as **Exhibit 2**. The Wind Down Amount shall be reduced on a dollar-for-dollar basis by the amount of cash received by the Debtors following the Closing in connection with Retained Assets or Retained Contracts and, to the extent such amount exceeds the Wind Down Budget, such excess shall be promptly paid to the Purchaser. For the avoidance of doubt, as provided in the APA, to the extent that there exists any residual Wind Down Amount remaining following payment of the items identified in the Wind Down Budget, such residual amounts shall be promptly paid to the Purchaser.

37.     Pursuant to the APA, the Purchaser and Sellers shall enter into the Transition Services Agreement on or prior to the Closing Date pursuant to which, effective as of the Closing Date, the Purchaser and Sellers shall provide certain services for a transitional period following the Closing Date. The Purchaser and Sellers are hereby authorized to execute and deliver any additional documentation as contemplated by the APA, and to perform all such other and further acts as may be required under or in connection with the Transition Services Agreement.

38.     Nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit regarding environmental laws that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal

requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

39. Nothing contained in any plan of liquidation or reorganization, or order of any type or kind entered in these Chapter 11 Cases, any subsequent chapter 7 or chapter 11 case of the Debtors, or any related proceeding subsequent to entry of this Sale Order, will conflict with or derogate from the terms of this Sale Order or the APA.

40. As soon as practicable following the Closing Date, but in no event more than thirty (30) days following the Closing Date, the Debtors shall (i) amend their organizational documents to change their corporate names to names that do not include the terms "Cleveland," "Integrity," "CIS," or any variation thereof and (ii) file a notice with the Court, which shall be in form and substance acceptable to the Purchaser, containing their new names and a case caption that reflects their new names. Upon the filing of such notice, the Clerk of the Court shall be authorized to amend the case caption as set forth therein.

41. The mere failure to specifically include any particular provisions of the APA, including any of the documents, agreements, or instruments executed in connection therewith in this Sale Order will not diminish or impair the efficacy of such provision, document, agreement, or instrument, it being the intent of this Court that the APA and each document, agreement or instrument be authorized and approved in its entirety, *provided*, *however*, to the extent there are any inconsistencies between the terms of this Sale Order and the APA (including all ancillary documents executed in connection therewith), the terms of this Sale Order will govern.

42. All time periods set forth in this Sale Order will be calculated in accordance with Bankruptcy Rule 9006(a).

43.     To the extent that this Sale Order is inconsistent with any prior order or pleading in these Chapter 11 Cases, the terms of this Sale Order will govern.

44.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court.

45.     The provisions of this Sale Order are nonseverable and mutually dependent.

46.     Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Sale Order will not be stayed after the entry hereof, but will be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and will not apply.

47.     This Court will retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.


Signed:   March 10, 2023

Christopher Lopez
United States Bankruptcy Judge

**EXHIBIT 1**

**Schedule of Cure Amounts**

| Name | Description | Cure Costs |
|------|-------------|------------|
| AGL Services Company | Master Service Agreement | $0 |
| Andeavor Field Services LLC and Tesoro Operations LLC | Master Service Agreement | $0 |
| Andy J. Egan Co., Inc. | Master Service Agreement | $0 |
| ASTAR, Inc. | Terms & Conditions | $0 |
| AT&T 105414 | Service Agreement | $0 |
| AT&T 5019 | Service Agreement | $0 |
| AT&T Mobility | Service Agreement | $0 |
| Atwell, LLC | Master Service Agreement | $0 |
| Badger Midstream Energy, LP | Master Service Agreement | $0 |
| Beta Crude Connector LLC – Frontier | Master Service Agreement | $0 |
| BlueCross BlueShield | Healthcare Benefits Service Agreement | $0 |
| Bluewater Gas Storage LLC | Master Service Agreement | $0 |
| Boardwalk Pipelines, LP | Alliance Agreement | $0 |
| Bond Brothers, Inc. | Professional Services Agreement | $0 |
| Bryan Texas Utilities | Contract for Professional Services | $0 |
| Buckeye Partners LP | Construction Management & Inspection Service Agreement | $0 |
| Burns & McDonnell Engineering Company, Inc. | Professional Services Agreement | $0 |
| Caiman Ohio Midstream, LLC | Master Service Agreement | $0 |
| Centurion Pipeline L.P. | Master Service Agreement | $0 |
| CF Industries Nitrogen, LLC | Professional Services Contract | $0 |
| Cheniere Corpus Christi Pipeline, LP | Master Service and Materials Agreement | $0 |
| Chesapeake Energy Corporation | Master Service Agreement | $0 |
| CHS McPherson Refinery, Inc. | Contract II Agreement | $0 |
| Cimarex Energy Company | Master Consulting Services Agreement | $0 |
| Citizens Energy Group | Master Operations & Maintenance Agreement | $0 |
| Coffeyville Resources Crude Transportation, LLC | Master Service Agreement | $0 |
| Comanche Trail Pipeline, LLC | General Services and Maintenance Agreement | $0 |
| Consumers Energy Company | General Contract for Technical and Consulting Services | $0 |
| CountryMark | Master Service Agreement | $0 |
| CPS Energy | Service Agreement | $0 |
| Crestwood Operations, LLC | Master Service Agreement | $0 |
| Cureton Midstream, LLC | Master Service Agreement | $0 |
| Dakota Access, LLC | General Services and Maintenance Agreement | $0 |
| DCP Midstream, LP | Master Service Agreement | $0 |
| Deeprock Tanks, LLC | Subcontractor Agreement | $0 |
| DISA Global Solutions, Inc. | Master Services Agreement | $0 |
| Dominion Energy Services, Inc. | Value Contract | $0 |
| Dominion Resources Services, Inc. | Master Service Contract | $0 |

1

| Name | Description | Cure Costs |
|------|-------------|------------|
| East Cheyenne Gas Storage, LLC | Master Service Agreement | $0 |
| Eastern Shore Natural Gas | Master Service Agreement | $0 |
| Easton Energy LLC | Master Service Agreement | $0 |
| Elite Midstream Services, Inc. | Master Service Agreement | $0 |
| Emergency Power Systems | Service Agreement | $0 |
| Enbridge Energy Company, Inc. and Enbridge (U.S.) Inc. | Master Services Agreement - U.S. Field Inspection | $0 |
| Enbridge (U.S.) Inc. | Enbridge Contingent Labor Agreement | $0 |
| Encino Energy | Master Service Agreement | $0 |
| Enerflex Energy Systems Inc. | Master Service Agreement | $0 |
| Energy Transfer Crude Oil Company, LLC | General Services and Maintenance Agreement | $0 |
| EnLink Midstream Operating, LP | Master Service Agreement | $0 |
| Enterprise Products Operating LLC | Service Contract | $0 |
| EOG Resources | Master Service Agreement | $0 |
| Epic Crude Pipeline, LP | Master Service Agreement | $0 |
| Epic Crude Terminal Company LP | Master Service Agreement | $0 |
| Epic Y-Grade Logistics, LP | Master Service Agreement | $0 |
| Epic Y-Grade Pipeline, LP | Master Service Agreement | $0 |
| Eversource Energy Service Company | Cover Agreement | $0 |
| Explorer Pipeline Company | Agreement | $0 |
| Express Services, Inc. | Staffing Agreement | $0 |
| Florida Gas Transmission Company, LLC | General Services Agreement | $0 |
| FLST, LLC | General Services and Maintenance Agreement | $0 |
| Genesis Energy, LLC, Genesis Energy, L.P. and Genesis Crude Oil, L.P. | Onshore Master Service Agreement | $0 |
| GFL Environmental Services USA, Inc. | Master Service Agreement | $0 |
| Gibson Energy Infrastructure, LLC | Master Service Agreement | $0 |
| Gulf Coast Express Pipeline LLC | On Call Inspection Services Agreement | $0 |
| Harvest Midstream Company | Master Service Agreement | $0 |
| Hilcorp Energy Company | Master Service Agreement | $0 |
| Holly Energy Partners, L.P. | Master Service Agreement | $0 |
| HollyFrontier Tulsa Refining LLC | Master Services Agreement | $0 |
| IRIS NDT | Master Service Agreement | $0 |
| Jefferson Gulf Coast Energy Partners LLC | Master Service Agreement | $0 |
| Jim Lyons | Employment Agreement | $0 |
| John Johnson | Employment Agreement | $0 |
| Jonah Energy, LLC | Master Service Agreement | $0 |
| Kaiser Frontier Midstream, LLC | Work Order | $0 |
| Kelly Services, Inc. | Agency Service Agreement | $0 |
| Kinder Morgan Contracting Services LLC | Inspection Services Agreement | $0 |

2

| Name | Description | Cure Costs |
|---|---|---|
| KNC, LLC | Lease Agreement for 7302 Northland Drive, Stanwood, MI 49346, as amended by Letter Agreement dated January 19, 2017 | $0 |
| LaGrange Acquisition, L.P. | General Services and Maintenance Agreement | $0 |
| Leaf Capital Funding, LLC | Lease Agreement for Lanier MI C6000 | $0 |
| Marathon Pipe Line LLC | Standard Service Contract | $0 |
| Matrix Service, Inc. | Services Agreement | $0 |
| McCarthy Building Companies, Inc. | Agreement | $0 |
| Mears Group, Inc. | Master Subcontract Agreement | $0 |
| Michael Frye | Employment Agreement | $0 |
| Michigan Gas Utilities Corp | Master Service Agreement | $0 |
| Microsoft | Subscription Service Agreement | $2,716.42 |
| Midship Pipeline Company, LLC | Master Service Agreement | $0 |
| Midship Pipeline Company, LLC and Societe Generale | Direct Agreement | $0 |
| Miller Pipeline LLC | Subcontract Agreement | $0 |
| Natural Gas Pipeline Company of America LLC | On Call Inspection Services Agreement | $0 |
| Netlink Solutions | Services Agreement | $0 |
| New Jersey Natural Gas Company | Field Service Contract | $0 |
| Nextera | Enterprise Agreement | $0 |
| NGL Crude Cushing, LLC | Master Service Agreement | $0 |
| NJNG | Master Service Agreement | $0 |
| Noble Midstream Services, LLC | Global Master Agreement for Goods and Services | $0 |
| Ohio River System LLC | General Services and Maintenance Agreement | $0 |
| Our Gang Properties, LLC | Lease Agreement for 370690 East Old Hwy 64, Cleveland, OK 74020 | $0 |
| Orbit Gulf Coast NGL Exports LLC | General Services and Maintenance Agreement | $0 |
| Panhandle Eastern Pipe Line Company, LP | General Services and Maintenance Agreement | $0 |
| Perdure Petroleum, LLC | Master Service Agreement | $0 |
| Performance Contractors, Inc. | Master Subcontract Agreement | $0 |
| Permian Highway Pipeline LLC | On Call Inspection Services Agreement | $0 |
| Phillips 66 Company | USA Master Services Agreement | $0 |
| Piedmont Natural Gas Company, Inc. | Master Inspection Services Agreement | $4,736.80 |
| Pitney Bowes Inc. | Lease Agreement; Equipment Service Agreement | $0 |
| Plains Marketing L.P. | Commercial Terms Agreement | $0 |
| Plug Power Inc. | Purchase Order | $0 |
| Puget Sound Energy, Inc. | Services Agreement | $0 |
| Randall Wantland | Employee Confidentiality, Non-Solicitation and Non-Compete Agreement | $0 |
| Randy Byers | Employment Agreement | $0 |
| Red Bluff Express Pipeline LLC | General Services and Maintenance Agreement | $0 |

3

| Name | Description | Cure Costs |
|---|---|---|
| Regus Management Group, LLC | Lease Agreement for 8951 Cypress Waters Blvd., Coppell, TX 75019 | $0 |
| Regus Management Group, LLC | Lease Agreement for 10777 Westheimer Road, Houston, TX 77042 | $0 |
| Reliastar Life Insurance Company | Payroll Benefits Service Agreement | $0 |
| Rimrock Telecom Services | Maintenance Agreement | $0 |
| Roaring Fork Midstream, LLC | Master Service Agreement | $0 |
| Rover Pipeline LLC | General Services and Maintenance Agreement | $0 |
| Saddle Butte Pipeline III, LLC | Master Services Agreement | $0 |
| Samson Exploration | Master Service Agreement | $0 |
| San Diego Gas & Electric Company | Master Service Agreement (8860040514) | $0 |
| San Diego Gas & Electric Company | Master Service Agreement (8860040373) | $0 |
| SEMCO Energy | Master Service Agreement | $0 |
| Sempra Utilities | Master Service Agreement | $0 |
| SiENergy, L.P. | Inspection Services Master Services Agreement | $0 |
| Southern California Gas Company | Master Service Agreement | $0 |
| Southern Cathodic Protection Co. | Subcontract Agreement | $0 |
| Southern Star Central Gas Pipeline, Inc. | General Service Agreement - Agreement Number 2011-5080 | $0 |
| Southern Star Central Gas Pipeline, Inc. | Master Service Agreement - Agreement Number 2016-5075 | $0 |
| Spectra Energy Services, LLC | Master Service Agreement | $0 |
| Spire STL Pipeline LLC | Field Services Agreement | $0 |
| Standley Systems | Service Agreement - Copiers | $0 |
| Stillwater Energy, Inc. | Contract for Professional Services | $0 |
| Strobel Energy Group LLC | Subcontract Agreement | $0 |
| Summit Midstream Partners, LP | Service Contract | $0 |
| Sunland Construction, Inc. | Subcontract Agreement | $0 |
| Sunoco Logistics | Master Service Agreement | $0 |
| Tallgrass Operations, LLC | General Services Agreement | $0 |
| Tampa Electric Company | Master Technical and Construction Services Agreement | $0 |
| Trans-Pecos Pipeline, LLC | General Services and Maintenance Agreement | $0 |
| Transwestern Pipeline Company, LLC | General Services and Maintenance Agreement | $0 |
| UGI Energy Services, Inc. | Master Service Agreement | $0 |
| United Parcel Service | Carrier Agreement | $0 |
| United Piping, Inc. | Professional Services Agreement | $0 |
| Utility Safety & Design Inc. | Labor and Materials Subcontract Agreement | $0 |
| Utility Technologies International Corporation | Subcontract Agreement for Professional Services | $0 |
| VCG LLC | Master Hosting Agreement | $0 |
| Veriforce | Professional Services Agreement | $0 |
| WBI Energy Transmission | General Services Contract | $0 |
| Wisconsin Electric Power Company | Contract (No. 4700004151) | $0 |

4

| Name | Description | Cure Costs |
|---|---|---|
| Web Benefits Design Corp. | Healthcare Benefits Portal Service Agreement | $0 |
| Wildcat Field Services, LLC | Master Service Agreement | $0 |
| Williams Field Services Company, LLC | Master Services Agreement | $0 |
| Williams Strategic Sourcing Company LLC | Master Construction and Maintenance Contract | $0 |
| WPS Information Engineering | Phone and Internet Service Agreement | $0 |
| Xcel Energy | Master Consulting Services Agreement | $0 |

Those fourteen (14) certain Letter Agreements, each dated November 17, 2022, between CIS, on the one hand, and the following individuals, on the other hand: Amber Hewitt, Bradley Harmon, Candy Barnes, David Travis, Jared Clemens, Jeremy Thomason, Jim Lyons, John Johnson, Lisa Gillilan, Matt Kesner, Michael Frye, Nick Totten-Gilbert, Randall Wantland and Sarah McGrew (collectively, the "Employee Letter Agreements"), all of which have Cure Costs of $0.

Those seventeen (17) certain Indemnification Agreements, each dated November 17, 2022, between CIS, on the one hand, and the following individuals, on the other hand: Amber Hewitt, Bradley Harmon, David Travis, Harold Gene Wells, James Lyons, Jared Clemens, Jeremy Thomason, John Gobber, John Johnson, Katherine Perry, Kseniya Rudel, Lisa Gillilan, Matt Kesner, Michael Frye, Nick Totten-Gilbert, Randall Wantland, Sarah McGrew (collectively, the "Employee Indemnification Agreements"), all of which have Cure Costs of $0.

Those certain Arbitration Agreements between CIS, on the one hand, and all current and former employees of CIS, on the other hand (collectively, the "Employee Arbitration Agreements"), all of which have Cure Costs of $0.

5

**EXHIBIT 2**

**Wind Down Budget**

| | | ACTUAL Accrued & Unpaid Through 4/30/2023 | FORECAST May 2023 | FORECAST June 2023 | FORECAST July 2023 | CUMULATIVE |
|---|---|---|---|---|---|---|
| **Updated: 3/02/2022** | | Cleveland Integrity Services - Post-Sale "Wind-Down" Budget | | | | |
| | **Beginning Book Balance** | **$3,031,553** | **$3,031,553** | **$2,857,649** | **$2,690,246** | |
| **Inflows** | Sales Proceeds | $0 | $0 | $0 | $0 | $0 |
| | Insurance - Premium Reimbursement | $0 | $0 | $0 | $0 | $0 |
| | Other (TBD) | $0 | $0 | $0 | $0 | $0 |
| | TOTAL INFLOWS | $0 | $0 | $0 | $0 | $0 |
| | **Available Cash** | **$3,031,553** | **$3,031,553** | **$2,857,649** | **$2,690,246** | |
| **Outflows** | **OPERATING COSTS** | | | | | |
| | Insurance | $0 | $28,406 | $28,406 | $28,406 | $85,218 |
| | Other (TBD) | $0 | $0 | $0 | $0 | $0 |
| | Contingencies | $0 | $0 | $0 | $0 | $0 |
| | Total Operating Costs | $0 | $28,406 | $28,406 | $28,406 | $85,218 |
| | **PROFESSIONAL FEES** | | | | | |
| | Debtor Advisors | | | | | |
| | Gray Reed | $0 | $50,000 | $50,000 | $50,000 | $150,000 |
| | MACCO | $0 | $50,000 | $50,000 | $50,000 | $150,000 |
| | Donlin Recano | $0 | $10,498 | $3,998 | $3,998 | $18,493 |
| | Redan Advisors | $0 | $30,000 | $30,000 | $30,000 | $90,000 |
| | Proskauer Rose LLP | $0 | $0 | $0 | $0 | $0 |
| | Professional Fees | $0 | $5,000 | $5,000 | $40,000 | $50,000 |
| | Piper Sandler | $0 | $0 | $0 | $0 | $0 |
| | US Trustee Fees | $0 | $0 | $0 | $30,000 | $30,000 |
| | Total Professional Fees | $0 | $145,498 | $138,998 | $203,998 | $488,493 |
| | **SALE PROCEEDS DISBURSEMENTS** | | | | | |
| | TBD | $0 | $0 | $0 | $0 | $0 |
| | Total Sale Proceeds Disbursements | $0 | $0 | $0 | $0 | $0 |
| | TOTAL OUTFLOWS | $0 | $173,904 | $167,404 | $232,404 | $573,711 |
| | **NET CASH BALANCE** | **$3,031,553** | **$2,857,649** | **$2,690,246** | **$2,457,842** | |

**EXHIBIT 3**

**Asset Purchase Agreement**

Execution Version

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**CIS PURCHASER, LLC,**

**CLEVELAND INTEGRITY SERVICES, INC.**

**AND**

**CIS TREASURY, LLC**

**January 29, 2023**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND INTERPRETATION ................................................2
    1.1     Definitions ...............................................................................2
    1.2     Interpretation ..........................................................................14

ARTICLE II PURCHASE AND SALE OF ASSETS ..............................................14
    2.1     Purchased Assets ....................................................................14
    2.2     Retained Assets ......................................................................18

ARTICLE III ASSUMPTION OF LIABILITIES ...................................................19
    3.1     Assumed Liabilities ...............................................................19
    3.2     Retained Liabilities ...............................................................20

ARTICLE IV CONSIDERATION .....................................................................22
    4.1     Purchase Price .......................................................................22
    4.2     Allocation of Purchase Price ...................................................22
    4.3     Cure Costs ............................................................................22

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS ...............23
    5.1     Organization and Good Standing. ............................................23
    5.2     Power; Authority; Enforceability ............................................23
    5.3     Title to Assets; Condition of Assets .........................................23
    5.4     Noncontravention; Governmental Filings .................................24
    5.5     Litigation ..............................................................................24
    5.6     Permits .................................................................................25
    5.7     Intellectual Property Rights ....................................................25
    5.8     Compliance with Laws ...........................................................26
    5.9     Employees ............................................................................26
    5.10    Employee Benefit Plans .........................................................27
    5.11    Real Property ........................................................................29
    5.12    Contracts..............................................................................29
    5.13    Environmental Matters ..........................................................30
    5.14    Insurance .............................................................................30
    5.15    Occupational Safety and Health Matters ..................................30
    5.16    Taxes ...................................................................................31
    5.17    Material Customers; Material Suppliers....................................32
    5.18    Affiliated Transactions ..........................................................33
    5.19    Brokers or Finders ................................................................33
    5.20    No Implied or Other Representations or Warranties....................33

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER ........34
    6.1     Organization and Good Standing .............................................34
    6.2     Power; Authority; Enforceability ............................................34
    6.3     Consents ..............................................................................34

|       |                                                                          |     |
|-------|--------------------------------------------------------------------------|-----|
| 6.4   | No Conflicts                                                             | 35  |
| 6.5   | Litigation                                                               | 35  |
| 6.6   | Brokers or Finders                                                       | 35  |
| 6.7   | No Implied or Other Representations or Warranties                        | 35  |

**ARTICLE VII CONDITIONS TO CLOSING** ..................................................... 36

| 7.1 | Conditions to Obligations of All Parties | 36 |
| 7.2 | Conditions to Purchaser's Obligations    | 36 |
| 7.3 | Conditions to Sellers' Obligations       | 37 |

**ARTICLE VIII COVENANTS** ........................................................................ 39

| 8.1  | Conduct of the Business    | 39 |
| 8.2  | Access                     | 41 |
| 8.3  | Bankruptcy Court Matters   | 41 |
| 8.4  | Employee Matters           | 42 |
| 8.5  | Publicity                  | 46 |
| 8.6  | Expenses                   | 46 |
| 8.7  | Further Assurances         | 46 |
| 8.8  | Governmental Approvals     | 46 |
| 8.9  | Notice of Certain Matters  | 47 |
| 8.10 | Bulk Transfer Laws         | 47 |
| 8.11 | Insurance                  | 47 |
| 8.12 | Change of Name             | 48 |

**ARTICLE IX CLOSING AND TERMINATION** ............................................... 48

| 9.1 | Closing               | 48 |
| 9.2 | Termination           | 49 |
| 9.3 | Effect of Termination | 50 |

**ARTICLE X TAX MATTERS** ......................................................................... 51

| 10.1 | Cooperation            | 51 |
| 10.2 | Transfer Taxes         | 51 |
| 10.3 | Provision of Tax Forms | 51 |
| 10.4 | Property Taxes         | 51 |
| 10.5 | Apportionment          | 51 |

**ARTICLE XI GENERAL PROVISIONS** ......................................................... 52

| 11.1  | Bankruptcy Court Approval                                                      | 52 |
| 11.2  | Notices                                                                        | 52 |
| 11.3  | Survival of Representations, Warranties, Covenants and Agreements             | 53 |
| 11.4  | Binding Effect                                                                 | 53 |
| 11.5  | Headings                                                                       | 53 |
| 11.6  | Exhibits and Schedules                                                         | 53 |
| 11.7  | Counterparts                                                                   | 53 |
| 11.8  | Governing Law/Jurisdiction                                                     | 54 |
| 11.9  | WAIVER OF JURY TRIAL                                                           | 54 |
| 11.10 | Waivers                                                                        | 54 |

| | | |
|---|---|---|
| 11.11 | Pronouns | 54 |
| 11.12 | Modification | 54 |
| 11.13 | Successors/Assignment | 54 |
| 11.14 | Entire Agreement | 54 |
| 11.15 | Severability | 55 |
| 11.16 | No Third Party Beneficiaries | 55 |
| 11.17 | Non-Recourse | 55 |
| 11.18 | Release of Sellers | 55 |
| 11.19 | Release of Purchaser | 56 |
| 11.20 | Negotiated Agreement | 57 |
| 11.21 | Specific Performance | 57 |
| 11.22 | Use of Corporate Name or Trademark | 58 |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is dated as of January 29, 2023, by and among (i)(a) Cleveland Integrity Services, Inc., an Oklahoma corporation ("**CIS**"), (b) CIS Treasury, LLC, a Texas limited liability company ("**CIS Treasury**" and together with CIS, collectively, "**Sellers**", and each a "**Seller**"), and (ii) CIS Purchaser, LLC, a Delaware limited liability company, or its designees or assignees ("**Purchaser**"). Purchaser and Sellers are also referred to herein individually as a "**Party**," and, collectively, as the "**Parties**."

## RECITALS

WHEREAS, Sellers intend to become debtors-in-possession under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Case**") (such filing date, the "**Petition Date**"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**");

WHEREAS, in connection with the Bankruptcy Case, the Purchaser shall credit bid on a dollar-for-dollar basis a portion of the outstanding Purchaser Secured Claims pursuant to Section 363 of the Bankruptcy Code;

WHEREAS, Sellers and Purchaser are entering into this Agreement subject to the final approval by the Bankruptcy Court;

WHEREAS, Sellers are engaged in the business of providing certain services to the oil and gas industry (including field engineering, construction management, and inspection) (the "**Business**");

WHEREAS, subject to the approval of the Bankruptcy Court, Sellers desire to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser desires to purchase, acquire, and assume from Sellers pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, all of the Purchased Assets, together with the Assumed Liabilities, as contemplated by this Agreement and the Ancillary Agreements (together with the other transactions contemplated hereby and thereby, collectively, the "**Transactions**"); and

WHEREAS, Sellers, as debtors and debtors-in-possession, will continue in the possession of their assets and in the management of the Business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

NOW THEREFORE, in consideration of the premises and mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

# ARTICLE I
## DEFINITIONS AND INTERPRETATION

1.1     <u>Definitions</u>. When used in this Agreement, the following terms in all of their tenses shall have the meanings assigned to them below or elsewhere in this Agreement as indicated below:

"***Accounts Receivable***" means all accounts, rights to payment and notes and other amounts receivable or payable to a Seller (whether current or non-current) otherwise arising from the conduct of the Business or otherwise, including such accounts, rights to payment and notes and other amounts receivable or payable to a Seller from credit card processors, affiliates, customers or other third parties.

"***Accrued Payroll***" means the amount of accrued and unpaid wages payable to employees of Sellers for services rendered on or after the date of this Agreement and prior to the Closing.

"***Accrued Payroll Cap***" means $10,000,000.

"***Affiliate***" means, with respect to any Person, any other Person that directly or indirectly, through one (1) or more intermediaries, controls, is controlled by, or is under common control with, such Person; <u>provided</u>, that with respect to Sellers, the term "Affiliate" expressly excludes each of: (i) First Reserve Management, L.P.; (ii) each of the investment funds sponsored by such entity and their respective Affiliates, and the various portfolio companies of each of such investment funds; (iii) each of their respective Affiliates (including, without limitation, their various portfolio companies), other than Eagle Infrastructure Services, Inc. or any of Eagle Infrastructure Services, Inc.'s direct subsidiaries; and (iv) each of the members, employees, officers, directors, managers, partners and direct and indirect equity holders in each of the entities identified in the immediately preceding clauses (i) through (iii) of this definition (clauses (i) through (iv), collectively, the "***Sponsor***"). The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"***Agreement***" is defined in the Preamble.

"***Alternative Transaction***" means a transaction or series of transactions involving a sale, transfer or other disposition of all or any material portion of the Purchased Assets to another purchaser or purchasers other than the Purchaser.

"***Apportioned Obligations***" is defined in <u>Section 10.4.</u>

"***Assumed Contracts***" is defined in <u>Section 2.1(f)</u>.

"***Assumed Liabilities***" is defined in <u>Section 3.1</u>.

"***Assumed Seller Plans***" is defined in <u>Section 2.1(u)</u>.

- 2 -

"***Avoidance Actions***" means any claim, right, or cause of action arising under chapter 5 of the Bankruptcy Code and any analogous state law claims related in any respect to the Purchased Assets or the Business.

"***Bankruptcy Case***" is defined in the Recitals.

"***Bankruptcy Code***" is defined in the Recitals.

"***Bankruptcy Court***" is defined in the Recitals and includes such other courts exercising competent jurisdiction over the Bankruptcy Case involving Sellers.

"***Bidding Procedures***" means the bidding procedures for the solicitation and submission of bids for a sale, reorganization, or other disposition of Sellers or all or substantially all of their assets approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"***Bidding Procedures Motion***" means the motion seeking entry of the Bidding Procedures Order.

"***Bidding Procedures Order***" means an order of the Bankruptcy Court approving the Bidding Procedures.

"***Bill of Sale and Assignment and Assumption Agreement***" means a Bill of Sale and Assignment and Assumption Agreement executed by Purchaser and Sellers, in a form acceptable to Purchaser.

"***Business***" is defined in the Recitals.

"***Business Day***" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close.

"***Business Employee***" means each Person who is employed by Sellers.

"***Business Social Media Accounts***" is defined in Section 5.7(b).

"***CIS***" is defined in the Preamble.

"***CIS Treasury***" is defined in the Preamble.

"***Claim***" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"***Closing***" and "***Closing Date***" are defined in Section 9.1.

"***COBRA***" means the continuation coverage provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as codified in Code Section 4980B and ERISA Sections 601 et seq., as amended from time to time, and the regulations and other guidance promulgated thereunder and any other similar provisions of state or local law.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

- 3 -

"**Contract**" means any commitment, understanding, instrument, lease, sub-lease, pledge, mortgage, indenture, license, agreement, purchase or sale order, contract, commitment, note, bond, franchise, guarantee, indemnity, instrument, promise or other arrangement evidencing or creating any legally binding obligation, whether written or oral (including all amendments, side-letters, supplements and modifications of any of the foregoing and all rights and interests arising thereunder or in connection therewith).

"**Contracting Parties**" is defined in Section 11.17.

"**Controlled Group Liability**" means any and all Liabilities (i) under Title IV of ERISA; (ii) under Section 302, 303, or 4068(a) of ERISA; (iii) under Section 412, 430 or 4971 of the Code; (iv) under Section 436 of the Code or Section 206(g) of ERISA; (v) as a result of the failure to comply with the continuation coverage requirements of ERISA Sections 601 *et seq.,* and Section 4980B of the Code or the group health requirements of Sections 701 *et seq.,* of ERISA and Sections 9801 *et seq.,* of the Code; (vi) for violation of HIPAA or the Patient Protection and Affordable Care Act of 2010, as amended; (vii) as a result of a failure to comply with the requirements of Section 414(t) of the Code; or (viii) under corresponding or similar provisions of any non-U.S. Law.

"**Credit Bid Amount**" is defined in Section 4.1.

"**Cure Costs**" means, with respect to the Assumed Contracts, all amounts, including pre-petition amounts, required to be paid or otherwise satisfied pursuant to the Bankruptcy Code in order to cure Sellers' monetary defaults under such Assumed Contracts at the time of the assumption thereof by, and the assignment thereof to, Purchaser as provided hereunder.

"**Cure Costs Cap**" means $100,000.

"**DIP Facility**" means the debtor-in-possession financing facility provided to Sellers under that certain Super-priority Debtor in Possession Credit Facility, dated as of the date hereof, by and among CIS, as the borrower, the guarantors party thereto, Owl Rock, as agent, and the lenders party thereto, and the DIP Orders, each as authorized by the Bankruptcy Court.

"**DIP Order**" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of the debtor-in-possession financing.

"**Encumbrances**" means any encumbrance, claim, community or other marital property interest, condition, equitable interest, right of way, encroachment, servitude, right of first refusal or similar restriction, including any restriction on use, voting right (in the case of any security or equity interest), transfer right, right to receipt of income or exercise of any other attribute of ownership.

"**Environmental Laws**" means all applicable federal, state, local, municipal and foreign Laws concerning public or human health and safety (as it relates to Hazardous Substances), endangered or threatened species, pollution, or protection of the environment (including ambient air, soil, soil gas, surface water, groundwater, sediments or subsurface strata), including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, labeling, discharge, release, threatened release, control, or cleanup of, or

- 4 -

exposure to, any Hazardous Substances (including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any regulations promulgated thereunder, and analogous state Laws).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means any Person (whether or not incorporated) which, together with the Seller, is (or at any relevant time was) required to be treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"***Excluded Employee Liabilities***" means the following liabilities of Sellers or any of their respective Affiliates relating to any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof: (i) any liability arising at any time under or in connection with any Seller Plan (other than any Assumed Seller Plan); (ii) any liability that constitutes a Pre-Closing COBRA Liability or a Pre-Closing WARN Act Liability; (iii) any Controlled Group Liability; (iv) any liability arising in connection with the actual or prospective employment or engagement, the retention and/or discharge by Sellers or any of their respective Affiliates of any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates; and (v) any employment, labor, compensation, pension, employee welfare and employee-benefits-related liabilities relating to any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, including but not limited to all liabilities related to or arising out of claims made by any such Person (a) for any statutory or common law severance or other separation benefits, (b) for any contractual or other severance or separation benefits and any other legally-mandated payment obligations (including any compensation payable during a mandatory termination notice period and any payments pursuant to a judgment of a court, tribunal or other authority having jurisdiction over the Parties), (c) with respect to any unfair labor practice, (d) under any state unemployment compensation or workers' compensation Law, (e) under any federal or state employment Law or other Law relating to employment, discrimination, classification, wage and hour (including claims or liabilities related to the Fair Labor Standards Act and any similar state Law), immigration, or (f) relating to any obligation to inform or consult with employees or other service providers, employee representatives, unions, works councils or other employee representative bodies in connection with the Transactions, in each case, (I) except as set forth in the following clause (II), associated with any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, arising at any time, or (II) associated with any Transferred Employee, arising on or prior to the Closing Date (excluding, for the avoidance of doubt in the case of this clause (II), liabilities in respect of go-forward compensation and benefits arrangements offered by Purchaser to Transferred Employees following their commencement of employment with Purchaser in accordance with Section 8.4).

"***Final Order***" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending; or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or

judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"*Governmental Approvals*" means any approval, consent, Permit, license, waiver, or other authorization issued, granted, given or otherwise made available by or under any Governmental Authority or pursuant to any Law.

"*Governmental Authority*" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, taxing authority, court or tribunal of competent jurisdiction.

"*Hazardous Substances*" means any pollutant, contaminant, chemical, material, substance, product, derivative, compound, mixture, solid, liquid, gas or waste and any other substance (in each instance, whether naturally occurring or manmade) that is hazardous (extremely, acutely or otherwise) toxic, infectious, carcinogenic, mutagenic, radioactive, a pollutant, a contaminant or is otherwise characterized by words of similar import or regulatory effect under or that could give rise to liability under any Environmental Law, including petroleum and petroleum-derived substances, products, by products and wastes, radon, radioactive materials or wastes, asbestos in any form, urea, formaldehyde, lead or lead-containing materials, polychlorinated biphenyls and per- and polyfluoroalkyl substances.

"*Improvements*" means all leasehold improvements located, placed, constructed or installed on or under any parcel of Leased Real Property (but only to the extent the related Real Property Leases constitute Assumed Contracts), including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration and cooling systems, facilities, lines, installations and conduits.

"*Insurance Policies*" is defined in Section 5.14.

"*Intellectual Property*" means any (a) trademarks and service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, including all applications, registrations and renewals of any of the foregoing, together with the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications, registrations and renewals of any of the foregoing, and works of authorship, whether or not copyrightable; (c) trade secrets, confidential know-how, discoveries, improvements, technology, business and technical information, databases, data compilations and collections,

tools, methods, processes, techniques, and other confidential and proprietary information; (d) patents and patent applications; (e) Software; (f) websites, internet domain name registrations and social media account or user names (including "handles"), all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto; and (g) all other intellectual and industrial property rights and assets, and all rights, interests and protections that are associated with any of the foregoing.

"***Intellectual Property Rights***" means all rights in, to, arising out of, or associated with any Intellectual Property in any jurisdiction throughout the world.

 "***IP Contract***" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to Intellectual Property Rights to which a Seller is a party, beneficiary or otherwise bound, and that are used or held for use in the conduct of the Business.

"***Knowledge of Sellers***" or any other similar knowledge qualification in this Agreement with respect to a Seller means, as to a particular matter, the actual knowledge of the following individuals, after reasonable investigation and inquiry: Dennis Woods, Louis Berezovsky, Laura Villa, Randy Byers and Matt Kesner.

"***Law***" means any federal, state, provincial, territorial, local, municipal, foreign, international, or multinational statute, law, ordinance, regulation, rule, code, Order, constitution, treaty, common law, judgment, decree, other requirement or rule of law enacted, adopted, promulgated, issued, applied by or administered or enforced by or on behalf of, any Governmental Authority or other similar authority.

"***Leased Real Property***" means all material real property leased by any Seller and used in connection with the Business.

"***Legal Proceeding***" means any judicial, administrative or arbitral action, investigation, litigation, suit, proceeding (public or private), cause of action, examination, dispute, charge, hearing, audit, assessment, inquiry or claim by or before any Governmental Authority, and any appeal from any of the foregoing.

"***liability***" means any liability (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, direct, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), debt, assessment, obligation, deficiency, interest, Tax, fine, penalty, damage, claim, demand, judgment, cause of action or other loss (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of when asserted.

"***Licensed Intellectual Property***" means the rights to any Intellectual Property Rights used or held for use in connection with the Business or the Purchased Assets that a Seller is licensed or otherwise is permitted by any other Person to use such Person's Intellectual Property Rights pursuant to an IP Contract.

"**Lien**" means any lien (statutory or otherwise), mortgage, hypothecation, deed of trust, right of use or possession, right of setoff, successor liability, servitude, encroachment, restriction or restrictive covenant, charge, covenant, condition, easement, adverse claim, demand, limitation, security interest, preference, priority, right of first refusal, option, pledge, title defect, or restriction or other Encumbrance, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"**Material Adverse Effect**" means any event, occurrence, fact, condition, development or change that (a) has, or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, liabilities, condition (financial or otherwise) or operating results of the Business, the Purchased Assets and/or the Assumed Liabilities or (b) has, or could reasonably be expected to prevent, materially delay, or materially impair the ability of the Sellers to carry out their respective obligations under this Agreement and/or to consummate the Transactions, except, in each case, as a result of the events leading up to, and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the continuation and prosecution thereof, including circumstances or conditions resulting from, or incidental to, such events, commencement, continuation and prosecution, or to the extent resulting from or arising in connection with (i) the pendency or consummation of the Transactions or the public announcement thereof; (ii) changes in national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iii) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index or any changes in currency exchange rates); (iv) changes in Law (or other binding directives or determination issued or made by or agreements with or consents of any Governmental Authority) or in GAAP or interpretations thereof; or (v) changes arising in connection with any earthquake, flood, hurricane, tornado or other act of God (but excluding any pandemic, other than the current public health crisis caused by the novel coronavirus known as COVID-19 or any escalation or worsening thereof), except, in the case of the foregoing clauses (ii), (iii), (iv) and (v), to the extent such event, occurrence, fact, condition, development or change has a disproportionate effect on the business, assets, liabilities, condition (financial or otherwise) or operating results of the Business, the Purchased Assets and/or the Assumed Liabilities, in each case, relative to other participants in the oil and gas services industries in which the Business operates.

"**Material Customers**" is defined in Section 5.17(a).

"**Material Suppliers**" is defined in Section 5.17(b).

"**Multiemployer Plan**" means a "multiemployer plan" (as defined in Section 3(37) of ERISA).

"**Non-Party Affiliates**" is defined in Section 11.17.

"**Occupational Safety and Health Law**" means any Law of any federal, state or local Governmental Authority enacted or promulgated which relates to Occupational Safety and Health Matters.

"**Occupational Safety and Health Liabilities**" means any liability, including any duty to indemnify, defend or reimburse, or other responsibility, arising under or relating to Occupational Safety and Health Laws, including any financial responsibility for any investigation, abatement action, engineering or administrative controls, the use of required personal protective equipment, and any other compliance, corrective action or remedial measures.

"**Occupational Safety and Health Matters**" means all matters related to health and safety of employees, temporary employees, independent contractors or employees of independent contractors at the Leased Real Property or otherwise in connection with the operation of the Business.

"**Omitted Contract**" is defined in Section 2.1(f).

"**Order**" means any award, decision, stipulation, determination, writ, declaration, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

"**Ordinary Course of Business**" means substantially the same manner in which the Business is conducted by Sellers immediately prior to the Petition Date, consistent with past practice.

"**Organizational Documents**" means (i) the articles or certificate of incorporation, the bylaws and any shareholders agreement of a corporation, (ii) the partnership agreement and any statement of partnership of a general partnership, (iii) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (iv) the operating or limited liability company agreement and certificate of formation or organization of any limited liability company, (v) any charter or similar document adopted or filed in connection with the creation, formation or organization of a Person and (vi) any amendment to any of the foregoing.

"**Owl Rock**" means Owl Rock Capital Corporation, a Maryland corporation.

"**Party**" and "**Parties**" are defined in the Preamble.

"**Permits**" means all approvals, authorizations, permits, provider numbers, certificates of need, certificates of exemption, licenses, franchises, approvals, authorizations, accreditations, registrations, certificates and consents required to be obtained from Governmental Authorities.

"**Permitted Liens**" means the liens listed on Schedule 1.1(a).

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Personal Information**" means personally identifiable information of Sellers' employees, other personnel, agents, officers, directors, contractors, patients, potential and prospective patients,

suppliers, and/or other Persons, which information may include name, address, other contact information, persistent identifier, financial account information, heath or medical information, insurance information, social security number, tax ID number, driver's license, mother's maiden name, date of birth, password, PIN number, employee ID number, payroll records, salary information or other human resources records and information, personal identification number or code, other account information and/or account activity information, other information or data that can be used for identity theft (including that which is not personally identifiable) or to identify a particular natural person, computer, device or software, and any other sensitive information regarding such Persons.

"***Petition Date***" is defined in the Recitals.

"***Post-Closing Tax Period***" means (a) any Tax period beginning after the Closing Date and (b) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period beginning after the Closing Date.

"***Post-Petition Assumed Liabilities Cap***" is defined in <u>Section 3.1(d)</u>.

"***Post-Petition Payables***" is defined in <u>Section 3.1(d)</u>.

"***Pre-Closing COBRA Liability***" means any liability arising under COBRA related to a qualifying event occurring on or prior to the Closing Date in respect of any current or former Business Employee or other service provider of Sellers or any of their respective Affiliates, or any spouse, dependent or beneficiary thereof, in any case who does not become a Transferred Employee.

"***Pre-Closing Tax Period***" means (a) any Tax period ending on or before the Closing Date and (b) with respect to a Tax period that commences before but ends  after the Closing Date, the portion of such period up to and including the Closing Date.

"***Pre-Closing WARN Act Liability***" means any liability arising under the WARN Act, in any case arising on or prior to the Closing Date.

"***Pre-Petition Facility***" means the pre-Petition Date financing facility provided to the debtors under that certain Credit Agreement, dated as of September 8, 2016, by and among CIS and CIS Treasury, each as a guarantor, the borrower and other guarantors party thereto, the lenders from time to time party thereto and Owl Rock, as administrative agent and as collateral agent, as amended, restated, supplemented or otherwise modified from time to time.

"***Pre-Petition Permitted Liens***" means (i) "Prepetition Permitted Liens" as defined in the DIP Facility, (ii) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the Ordinary Course of Business, and (iii) other imperfections of title or Liens, if any, that have not had, and would not have, a Material Adverse Effect.

"***Property Taxes***" means all real property taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for any Tax period.

"***Purchase Price***" is defined in <u>Section 4.1</u>.

"**_Purchased Assets_**" is defined in Section 2.1.

"**_Purchaser_**" is defined in the Preamble.

"**_Purchaser Documents_**" is defined in Section 6.2.

"**_Purchaser Fundamental Representations_**" means the representations in Section 6.2 (Power; Authority; Enforceability) and Section 6.6 (Brokers or Finders).

"**_Purchaser Released Causes of Action_**" is defined in Section 11.18.

"**_Purchaser Released Parties_**" is defined in Section 11.19.

"**_Purchaser Releasing Parties_**" is defined in Section 11.19.

"**_Purchaser Secured Claims_**" means the aggregate amount of (i) all obligations owing by Sellers as of the Closing under the DIP Facility, including any unpaid principal, interest, fees, and costs and (ii) all obligations owing by Sellers as of the Closing under the Pre-Petition Facility, including any unpaid principal, interest, fees and costs.

"**_Real Property Leases_**" has the meaning set forth in Section 5.11(b).

"**_Registered Transferred Intellectual Property Rights_**" is defined in Section 5.7(a).

"**_Related Company Acquisitions_**" means the sale, assignment, transfer or other acquisition or conveyance of the equity interests and/or assets comprising the business and operations of each of (i) Applied Consultants, Inc., a Texas corporation, (ii) Encompass Services, LLC, a Texas limited liability company, and (iii) Perennial Environmental I, LLC, a Texas limited liability company, and, in each case, any subsidiaries thereof, to Purchaser or one (1) or more of its Affiliates, in each case, on terms and conditions which are acceptable to Purchaser or such Affiliates, as applicable, in their sole discretion.

"**_Related Party_**" means any member, employee, officer, director, equityholder or partner of a Seller or any immediate family member of any of the foregoing or any of its Affiliates.

"**_Retained Assets_**" is defined in Section 2.2.

"**_Retained Contracts_**" means all Contracts to which any Seller is a party and which are not Assumed Contracts, and including, for the avoidance of doubt, all Contracts set forth on Schedule 2.2(g).

"**_Retained Liabilities_**" is defined in Section 3.2.

"**_Sale Hearing_**" means the hearing conducted by the Bankruptcy Court to approve the Transactions or an Alternative Transaction.

"**Sale Motion**" means the motion, in form and substance reasonably acceptable to Sellers and Purchaser, filed by Sellers pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code to obtain entry of the Sale Order.

"**Sale Order**" means the Final Order of the Bankruptcy Court, to be issued by the Bankruptcy Court pursuant to sections 363, 365 section 1146(c), of the Bankruptcy Code in a form and substance acceptable to Purchaser (in its sole discretion), (i) approving this Agreement and the Transactions, (ii) approving the sale of the Purchased Assets to Purchaser free and clear of all Liens, Claims, interests and Encumbrances pursuant to section 363(f) of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, (iii) approving the assumption and assignment to Purchaser of the Assumed Contracts, in each case, on the terms and subject to the conditions set forth in this Agreement, (iv) mutual releases between and among Purchaser and the Sellers and (v) finding that (a) Purchaser purchased the Purchased Assets for reasonably equivalent value, (b) the sale of the Purchased Assets was negotiated at arm's length, (c) Purchaser is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code, and (d) Purchaser shall not be a successor in interest to Seller for any purpose and that the sale is free and clear of any successor liability claims.

"**Seller Documents**" is defined in <u>Section 5.2</u>.

"**Seller Fundamental Representations**" means the representations in <u>Section 5.1</u> (Organization and Good Standing), <u>Section 5.2</u> (Power; Authority; Enforceability), <u>Section 5.3</u> (Title to Assets), clause <u>(a)</u> of <u>Section 5.4</u> (Noncontravention; Governmental Filings) and <u>Section 5.19</u> (Brokers or Finders).

"**Seller Plan**" means each "employee benefit plan" (as defined in ERISA § 3(3), whether or not subject to ERISA) or other benefit or compensation plan, program, policy, practice, contract, agreement, or arrangement providing for retirement, medical, dental, vision, prescription drug, employee assistance, wellness, severance, vacation, termination pay, workers' compensation, disability, death, hospitalization, relocation, cafeteria, dependent care, commuter or transportation, adoption assistance, tuition reimbursement, relocation, retention, change of control, deferred compensation, short-term incentive, long-term incentive, performance awards, stock or stock-related awards, fringe benefits or other employee benefits of any kind maintained, sponsored, or contributed or required to be contributed to by Sellers or any of their respective ERISA Affiliates or with respect to which Sellers or any of their respective ERISA Affiliate have, or could reasonably be expected to have, any liability, other than governmental plans, programs, agreements or arrangements, or any plans, programs, agreements or arrangements mandated by a Governmental Authority or by applicable Law.

"**Seller Released Causes of Action**" is defined in <u>Section 11.19</u>.

"**Seller Released Parties**" is defined in <u>Section 11.18</u>.

"**Seller Releasing Parties**" is defined in <u>Section 11.18</u>.

"**Sellers**" is defined in the Preamble.

- 12 -

"**Software**" means any and all computer programs, including operating system and applications software, firmware, computerized implementations of algorithms, program interfaces and other code, whether in source code or object code form (including all of the foregoing that is installed on computer hardware), including data files, databases, and related protocols, specifications, and all available documentation, including user manuals, relating to the foregoing.

"**Sponsor**" is defined in the definition of Affiliate.

"**Sponsor Claims**" is defined in Section 2.1(l).

"**Tax**" means, whether disputed or not, (i) any U.S. federal, state, local or non-U.S. income, profits, license, severance, occupation, windfall profits, capital gains, capital stock, transfer, registration, social security (or similar), production franchise, gross receipts, payroll, sales, employment, use, property (real or personal), excise, customs, value added, estimated, stamp, alternative or add-on minimum, withholding (including backup withholding), lease, service, service use, recording, documentary, intangibles, conveyancing, gains, unemployment, disability, net worth, escheat, abandoned property, environmental, premium, real property gains tax, impost or other compulsory payment to a Governmental Authority, including any interest and penalties imposed with respect to such amounts and any additions to such amounts and (ii) any liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement (including, but not limited to, any tax sharing or allocation arrangement, any agreement to indemnify such other Person or deemed agreement created by operation of law), being a successor or transferee of such other Person, or being (or ceasing to be) a member of the same affiliated, consolidated, combined, unitary or other group with such other Person.

"**Tax Returns**" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"**Termination Date**" is defined in Section 9.2(d)(i).

"**Transactions**" is defined in Recitals.

"**Transaction Documents**" means the Bidding Procedures Order, the Sale Order, the Bills of Sale and Assignment and Assumption Agreements, and the other agreements, certificates, and instruments executed and delivered in connection with this Agreement or any of the foregoing (or the Transactions).

"**Transfer Taxes**" means any and all sales, use, transfer, recording, stamp or other similar taxes or charges assessed with respect to the transfer of any Purchased Assets pursuant to this Agreement.

"**Transfer Taxes Cap**" is defined in Section 3.1(e).

"**Transferred Employee**" is defined in Section 8.4(a).

"**Transferred Intellectual Property Rights**" means all Intellectual Property Rights owned by any Seller and used in the operation of the Business.

"**Transition Services Agreement**" means a Transition Services Agreement executed by Purchaser and Sellers, in a form acceptable to Purchaser.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, as amended and any similar state or local "mass layoff" or "plant closing" Laws.

"**Welfare Claims**" is defined in <u>Section 8.4(c)</u>.

"**Wind Down Amount**" means an amount of Sellers' cash estimated in good faith by Sellers and acceptable to Purchaser, as necessary for Sellers to (i) subject to the terms of the DIP Facility and the capped amounts in the Approved Budget (as defined in the DIP Facility), (x) satisfy the allowed fees and expenses of estate professionals that have accrued and are unpaid as of the Closing Date, and (y) pay all accrued, unpaid and allowed administrative expense claims in the Bankruptcy Case, and (ii) fund an orderly liquidation, dismissal or conversion of the Bankruptcy Cases and the dissolution of the Sellers to be used in accordance with the Wind Down Budget (which shall be attached as an exhibit to the Sale Order); <u>provided</u>, that, to the extent there is any residual amount remaining after the payment of the items set forth in <u>clauses (i)</u>-<u>(ii)</u>, such amounts shall be promptly delivered to Purchaser. In the event that the Sellers have insufficient cash-on-hand to fund the Wind Down Amount, Purchaser shall have no obligation to fund any shortfall. For the avoidance of doubt, Accrued Payroll shall not be included in the Wind Down Amount.

"**Wind Down Budget**" means the budget set forth in <u>Schedule 1.1(b)</u>.

1.2    <u>Interpretation</u>. When a reference is made in this Agreement to a Section, Schedule or Exhibit, such reference shall be to a Section, Schedule or Exhibit of this Agreement unless otherwise indicated.  Whenever the words "included," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation."  All defined terms shall include the insular or plural as required by context.  Unless otherwise indicated, all references to dollars refer to United States dollars. The Parties acknowledge that both Purchaser, on the one hand, and Sellers, on the other hand, have participated in the drafting and preparation of this Agreement and agree that any rule of construction to the effect that ambiguities are to be construed against the drafting party shall not be applied to the construction or interpretation of this Agreement.

## ARTICLE II
## <u>PURCHASE AND SALE OF ASSETS</u>

2.1    <u>Purchased Assets</u>. Subject to the terms and conditions of this Agreement and pursuant to Sections 363 and 365 of the Bankruptcy Code, effective as of the Closing and in accordance with the Sale Order, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, free and clear of all Liens except the Permitted Liens, and Purchaser shall purchase, all right, title and interest of Sellers in and to all assets, properties, claims and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill) wherever located and

whether now existing or hereafter acquired (other than the Retained Assets) (collectively, the "***Purchased Assets***"), including the following:

(a)    All cash, bank deposits, certificates of deposit, and cash equivalents (including all undeposited checks, marketable securities and short term investments) of Sellers, except to the extent such amounts are necessary to fund the Wind Down Amount;

(b)    All bank accounts of Sellers other than accounts established for the retention of the Wind Down Amount, safety deposit boxes, lock boxes and other cash management accounts (including cash amounts in any accounts against which outstanding bank drafts have been written, to the extent of the amount of such bank drafts);

(c)    All tangible personal property owned or leased by Sellers, wherever located, including, but not limited to, all machinery, equipment, tools, fixtures, parts, supplies, furniture, furnishings, motor vehicles, inventory, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure and telephone systems (including any of the foregoing property that is subject to a finance lease, but only to the extent that Purchaser assumes such finance lease as an Assumed Contract);

(d)    [Reserved];

(e)    The Transferred Intellectual Property Rights and all other manuals, instructions, documents and protocols relating thereto, including those listed on Schedule 2.1(e), including (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Sellers with respect to the Transferred Intellectual Property Rights; and (ii) claims and causes of action with respect to the Transferred Intellectual Property Rights accruing on or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation or other violation thereof, and rights to protection of interests therein under the Laws of all jurisdictions;

(f)    All of the Real Property Leases and other Contracts that are listed on Schedule 2.1(f) (along with the Cure Costs associated with each), and all Leased Real Property associated with such Real Property Leases, and all rights of any kind relating to any of the foregoing, including rights to payments thereunder (collectively, the "***Assumed Contracts***") (and in each case, all Avoidance Actions related thereto); provided, however, by written notice to the Sellers, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 2.1(f) (i) at any time prior to the Sale Hearing, in order to add any Contract to such Schedule 2.1(f) and it shall be automatically included as an Assumed Contract for purposes of this Agreement, or remove any Contract to such Schedule 2.1(f) and it shall  automatically be deemed a Retained Contract for purposes of this Agreement, and (ii) at any time after the Closing Date to remove any Contract from such Schedule 2.1(f) in the event that after Closing, (A) the Bankruptcy Court determines (or the parties otherwise agree) that the actual Cure Costs exceed the estimated Cure Costs listed on Schedule 5.12(a), or (B) a timely filed objection to a Cure Cost or to Purchaser's assumption and assignment of a Contract is not resolved, and such removed Contract shall be automatically deemed a Retained Contract for purposes of this Agreement; provided, that Purchaser has notified Sellers in writing of the removal of any such Contract no later than thirty (30) days following the final determination of the actual Cure Cost of such Contract. Furthermore, if it is discovered that

- 15 -

a Contract should have been listed on Schedule 5.12(a) but was omitted therefrom (an "**Omitted Contract**"), Sellers shall, promptly following discovery thereof (but in no event later than three (3) Business Days after such discovery), (A) notify Purchaser in writing of such Omitted Contract and the corresponding related Cure Costs thereof (if any) and (B) if requested by Purchaser in writing, file a motion with the Bankruptcy Court on notice to the counterparties to such Omitted Contract seeking entry of an Order fixing the Cure Costs and approving the assumption and assignment of such Omitted Contract in accordance with this Section 2.1(f) (provided, that no Omitted Contract shall be assumed by and assigned to Purchaser unless such Omitted Contract shall be expressly accepted at such time in writing by Purchaser as an Assumed Contract). With respect to each Assumed Contract, Purchaser shall provide adequate assurance of the future performance of such Assumed Contract to the applicable counterparty to such Assumed Contract.

(g)     All Permits listed on Schedule 2.1(g), but only to the extent such Permits may be transferred under applicable Law;

(h)     All of Sellers' rights under warranties, indemnities and all similar rights against third parties to the extent related to the Business or any Purchased Assets;

(i)     All rights with respect to prepaid expenses, credits, advance payments, security, deposits, charges, sums, and any cash collateral used to secure surety bonds, performance bonds or other transactional assurances to the extent related to the Business or any Purchased Assets, including, any deposits made by the Sellers to any third parties;

(j)     Originals, or where not available or to the extent retained by Sellers for Tax purposes, copies, of all books and records, files and papers including books of account, ledgers and general, financial and accounting records, supplier lists, production data, quality control records and procedures, patient complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), strategic plans, internal financial statements and marketing and promotional surveys, material and research, documentation relating to the Transferred Intellectual Property Rights, and other similar documents and records, that relate to the Business or the Purchased Assets;

(k)     Copies of all Tax records;

(l)     All rights to any Legal Proceedings, credits, allowances, rebates, or rights of setoff (other than against Sellers or any of their respective Affiliates) or claims of any nature available to or being pursued by Sellers arising out of or relating to the Business or any of the Purchased Assets or Assumed Liabilities, whether arising by way of counterclaim or otherwise, including but not limited to (i) claims for breach of contract, or breach of fiduciary duty or tort claims, (ii) all of Sellers' claims or causes of action, including Avoidance Actions and those vested in any Seller under Sections 541, 542, 544, 545, 547, 548 and 549 (and, to the extent applicable for remedies, Sections 550 and 551) of the Bankruptcy Code and (iii) all of Sellers' claims or causes of action (if any) existing or hereafter arising in law, equity, contract, tort, or otherwise, against the Sponsor (the "**Sponsor Claims**");

(m)     All Accounts Receivable (whether billed or unbilled), and any security, claim, remedy or other rights related to such Accounts Receivable or to the collectability thereof;

(n)      All Improvements;

(o)      All rights to the telephone and facsimile numbers and email addresses used by Sellers;

(p)      (i) All Insurance Policies that may be transferred or assigned to Purchaser, except to the extent included as a Retained Asset on Schedule 2.2(c), including but not limited to the rights to make, administer and settle claims under any such Insurance Policies and to pursue and exhaust applicable coverage (including initiating, prosecuting and resolving litigation), and (ii) the amount of, and all rights to any insurance proceeds received by Sellers under any such Insurance Policies after the date hereof in respect of any loss, liability, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or relating, in any respect, to any Assumed Liabilities.

(q)      All rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of any Seller or with third parties (including, any non-disclosure or confidentiality, non-compete or non-solicitation agreements entered into in connection with an Auction (as defined in the Bidding Procedures Order)), in each case, which relate to the Business or any of the Purchased Assets or Assumed Liabilities;

(r)      All unexpired, transferable warranties, indemnities, or guaranties from any third party with respect to the Business or any Purchased Asset or Assumed Liability, including any item of real property, personal property or equipment;

(s)      All employee and personnel records, including all current employment eligibility verification forms and all other records related to employment, documents and papers, of the Transferred Employees;

(t)      Any assets Tax Returns, Tax refunds, rebates, abatements, adjustments, credits, prepayments of Taxes and similar items of any Seller;

(u)      All rights in or under the Seller Plans that are maintained, sponsored, or contributed or required to be contributed to by Sellers for the benefit of any Transferred Employee, as set forth on Schedule 2.1(u) (each, an "**Assumed Seller Plan**"), including all pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith; provided, that, by written notice to the Sellers, Purchaser may, in its sole and absolute discretion, amend or revise Schedule 2.1(u) after the date hereof but no later than ten (10) days prior to the Closing Date in order to (i) add any Seller Plan to such Schedule 2.1(u) and it shall be automatically included as an Assumed Seller Plan for purposes of this Agreement or (ii) remove any Assumed Seller Plan from such Schedule 2.1(u) and it shall be automatically deemed a Retained Asset for purposes of this Agreement;

(v)      All goodwill and other intangible property and all privileges, relating to, arising from or associated with any of the assets described in the foregoing clauses, the Assumed Liabilities and/or the Business; and

- 17 -

(w)     All other properties, assets and rights owned by Sellers as of the Closing Date, or in which Seller has an interest, which are used in or relates to the Business and which are not otherwise Retained Assets.

2.2     <u>Retained Assets</u>. Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include any of the following assets, properties or rights (collectively, the "***Retained Assets***"):

(a)     The Wind Down Amount;

(b)     All rights of Sellers under this Agreement, the Transaction Documents or the Retained Contracts;

(c)     (i) All Insurance Policies of each Seller set forth on <u>Schedule 2.2(c)</u>, and all credits, premium refunds, proceeds, causes of action or rights arising thereunder in respect of any loss, liability, destruction or condemnation of any Retained Assets occurring prior to, on or after the Closing or relating to any Retained Liabilities, (ii) any and all insurance refunds or claims made under any Insurance Policies relating to the Purchased Assets or the Assumed Liabilities on or before the Closing Date, and (iii) the amount of, and all rights to any insurance proceeds under any Insurance Policies received by either the Sellers or Purchaser after the date hereof in respect of the loss, destruction or condemnation of any Retained Assets occurring prior to, on or after the Closing or relating to any Retained Liabilities;

(d)     The Organizational Documents, minute books, qualifications to conduct business as a foreign corporation or limited liability company, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, personnel records, and stock records of Sellers and other similar books and records, financial records, books of account, bank and brokerage records and statements and any other books and records which Sellers are prohibited from disclosing or transferring to Purchaser under applicable Law or are required by applicable Law to retain;

(e)     All shares of capital stock or other equity interests issued in or issued by a Seller;

(f)     All nontransferable Permits;

(g)     All Contracts of Sellers other than the Assumed Contracts (including those set forth on <u>Schedule 2.2(g)</u>);

(h)     All Seller Plans and any assets of any Seller Plan or any right, title or interest in any of the assets thereof or relating thereto (other than Assumed Seller Plans);

(i)     All Avoidance Actions that are not otherwise Purchased Assets as described in <u>Section 2.1</u>; and

(j)     The assets, properties and rights specifically set forth on <u>Schedule 2.2(j)</u>.

- 18 -

Notwithstanding anything in this Agreement to the contrary, by written notice to the Sellers, Purchaser may, in its sole and absolute discretion, amend or revise this <u>Section 2.2</u> in order to add, remove or otherwise modify the items set forth above, including to amend or revise <u>Section 2.2(g)</u> at any time prior to the Closing Date, including in order to add any Contract to <u>Schedule 2.2(g)</u>, and it shall be automatically included as a Retained Contract for purposes of this Agreement, or remove any Contract from <u>Schedule 2.2(g)</u> and it shall be automatically deemed an Assumed Contract for purposes of this Agreement.

## ARTICLE III
## <u>ASSUMPTION OF LIABILITIES</u>

3.1     <u>Assumed Liabilities</u>. Purchaser shall assume no obligation or other liability of any Seller, or of any predecessor or any Affiliate of any Seller, other than the obligations and other liabilities explicitly set forth in this <u>Section 3.1</u>. Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective as of the Closing Date, to assume, pay, perform and discharge when due (subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities are owed), only the following liabilities, responsibilities and obligations of Sellers existing as of the Closing Date (collectively, as modified as applicable pursuant to the last paragraph of this <u>Section 3.1</u>, the "***Assumed Liabilities***"):

(a)     All of Sellers' liabilities, responsibilities and obligations under the Assumed Contracts to the extent first arising out of or relating to events, occurrences, acts or omissions occurring solely from and after the Closing Date;

(b)     All claims, liabilities, responsibilities, obligations, costs and expenses arising in any way out of the operation of the Business or the ownership or operation of the Purchased Assets but solely to the extent first arising out of or relating to events, occurrences, acts or omissions occurring solely from and after the Closing Date, including, any and all Taxes arising out of or attributable to the operation or ownership of the Purchased Assets and the Business so long as such Taxes have both arisen and become due and payable solely from and following the Closing Date and excluding, for the avoidance of doubt, all Tax liabilities of any member of an affiliated, consolidated, combined or unitary group of which any Seller or any of its subsidiaries or affiliates (or any predecessor of any of the foregoing) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation §1.1502-6 and §1.1502-13 or any analogous or similar state, local, or non-U.S. regulation or other Law, and further excluding any and all Taxes of any Person imposed on the Seller or any of its subsidiaries (including with respect to the Purchased Assets) as a transferee or successor, by contract or pursuant to any rule, regulation or other Law, which Taxes relate to an event or transaction occurring prior to the Closing Date;

(c)     Subject to <u>Section 2.1(f)</u>, all Cure Costs up to the Cure Costs Cap;

(d)     All accounts payable of the Business incurred in the Ordinary Course of Business after the Petition Date that are entitled to priority status under Section 503(b) of the Bankruptcy Code (it being understood that trade payables and accrued liabilities shall not include any fees or expenses due to professional persons retained by Sellers or any other party involved in the Bankruptcy Case, including any creditors' committee) and identified on <u>Schedule 3.1(d)</u> prior

- 19 -

to Closing (collectively, the "***Post-Petition Payables***") up to an aggregate amount of $853,391 (the "***Post-Petition Assumed Liabilities Cap***").

(e)     One hundred percent (100%) of the Transfer Taxes; <u>provided</u>, that the aggregate amount of Transfer Taxes assumed by the Purchaser pursuant to this <u>Section 3.1(e)</u> shall not exceed $25,000 (the "***Transfer Taxes Cap***"); and

(f)     The Accrued Payroll.

Nothing contained in this Agreement shall require Purchaser to pay or discharge any Assumed Liabilities (i) prior to such Assumed Liabilities becoming due and payable in accordance with the underlying terms of any Assumed Contract giving rise to or governing such Assumed Liabilities or (ii) so long as Purchaser shall in good faith contest the amount or validity thereof. The Parties acknowledge and agree that the disclosure of any obligation or liability on any schedule to this Agreement or the Transaction Documents shall not create an Assumed Liability or liability of Purchaser, except where such disclosed liability has been expressly assumed by Purchaser as an Assumed Liability in accordance with the provisions of this <u>Section 3.1</u>.

Notwithstanding anything in this Agreement to the contrary, by written notice to the Sellers prior to the Sale Hearing, Purchaser may, in its sole and absolute discretion, amend or revise any scheduled referenced in this <u>Section 3.1</u> in order to add, remove or otherwise modify the items set forth above. Any liabilities associated with any Contract removed from <u>Schedule 2.1(f)</u> pursuant to <u>Section 2.1(f)</u> or set forth on <u>Schedule 2.2(g)</u> shall be automatically deemed Retained Liabilities for purposes of this Agreement.

3.2     <u>Retained Liabilities</u>. Notwithstanding anything to the contrary in this Agreement or the Transaction Documents, Purchaser shall not assume or be obligated for any liabilities, Claim, Encumbrance, assessments or obligations of any and every kind whatsoever, direct or indirect, known or unknown, absolute or contingent, or whatever nature, whether presently in existence or arising hereafter, not expressly assumed by Purchaser under <u>Section 3.1</u> and shall under no circumstances be liable or responsible for any liabilities (other than the Assumed Liabilities) of any Seller, or any predecessor or Affiliate thereof, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstance taking place prior to the Closing. Purchaser shall not be a successor in interest to any of the Sellers for any purpose and is not answerable for any successor liability Claims. Sellers shall retain all liabilities, responsibilities and obligations of Sellers not specifically included in the Assumed Liabilities (all such liabilities, responsibilities and obligations not being assumed being herein referred to, collectively, as the "***Retained Liabilities***").  For the avoidance of doubt, the Retained Liabilities shall include each of the following items:

(a)     Any liability which is not expressly listed as an Assumed Liability in <u>Section 3.1</u>, including any Claims under Section 503 and 507 of the Bankruptcy Code;

(b)     Any liabilities of any of the Sellers not related to the operation of the Business or the Purchased Assets;

(c)      Any and all liabilities for Taxes, except as otherwise provided in <u>Section 3.1(b)</u>, <u>Section 3.1(f)</u> or <u>ARTICLE X</u>;

(d)      Any liabilities relating to or arising out of the Retained Assets;

(e)      Any liabilities in respect of any Retained Contracts, including any liabilities arising out of the rejection of any such Contracts pursuant to section 365 of the Bankruptcy Code;

(f)      Any liabilities to any current or former equityholder or Affiliate of any Seller;

(g)      Any liabilities relating to investigations, Claims or other Legal Proceedings (including any workers' compensation matters and all liabilities arising in connection therewith) which arise out of, relate to or otherwise are in respect of (i) the existence, use or operation of the Business or the Purchased Assets prior to the Closing Date, and/or (ii) any actual or alleged violation of any applicable Law (including any Environmental Law and any Occupational Health and Safety Law) or Order by any of the Sellers (or their respective Affiliates);

(h)      Any liabilities arising from the ownership or operation of the Business and/or the Purchased Assets prior to the Closing, including, (i) in respect of indebtedness (including arising under any intercompany loan arrangements or promissory notes), and (ii) all accounts payable (including vendor trade payables) that are not Assumed Liabilities pursuant to <u>Section 3.1(a)</u>;

(i)      Any liabilities arising under Environmental Law or with respect to Hazardous Substances in connection with the ownership or operation of the Business and/or the Purchased Assets prior to the Closing, including in respect of the actual or alleged presence, release or threatened release of, or exposure to, any Hazardous Substances and the transportation, storage, treatment, disposal, labeling, generation, manufacturing, recycling, reclamation, use or other handling of any Hazardous Substances;

(j)      Any Excluded Employee Liability, except with respect to such liabilities arising under any Assumed Contract or any Assumed Seller Plan (including to the Internal Revenue Service or United States Department of Labor);

(k)      Any costs, fees, commissions, expenses and other liabilities owing to any broker, investment banker, financial or restructuring advisor, outside counsel, auditing firm or consultant retained by or on behalf of any Seller (or any of its Affiliates), whether relating to or arising out of the Transactions or otherwise, except as otherwise permitted in the DIP Order;

(l)      Any liability of any Seller with respect to any Lien (except Permitted Liens) (including with respect to the Business and/or the Purchased Assets, to the extent arising out of or relating to the existence, use or operation of the Business or the Purchased Assets prior to the Closing); and

(m)      Any liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of any Seller (or any of its Affiliates) (including with respect to any breach of fiduciary obligations by same).

Notwithstanding anything in this Agreement to the contrary, but without limiting, amending or otherwise modifying any of the rights set forth in Sections 2.1 and/or 2.2 above, within ten (10) Business Days following the delivery by the Sellers of the final and complete Disclosure Schedules, by written notice to the Sellers, Purchaser may, in its sole and absolute discretion, amend or revise this Section 3.2 in order to add, remove or otherwise modify the items set forth above.

# ARTICLE IV
# CONSIDERATION

4.1    Purchase Price. The total consideration to be paid by Purchaser to Sellers for the Purchased Assets (the "**Purchase Price**") is: (a) a credit bid, on a dollar-for-dollar basis, pursuant to section 363(k) of the Bankruptcy Code, in an aggregate amount of not less than $30,000,000, of a portion of the Purchaser Secured Claims, comprised of (i) the full amount of the obligations owing by the Sellers as of the Closing under the DIP Facility, including any unpaid principal, interest, fees, and costs, and (ii) a portion of the obligations owing by the Sellers as of the Closing under the Pre-Petition Facility (the amount of such credit bid, which may be increased by the Purchaser, in the Purchaser's sole discretion, at any time prior to the Closing, and such amount, "**Credit Bid Amount**"); (b) the payment by Purchaser of the Cure Costs (subject to the Cure Costs Cap); (c) the assumption by Purchaser of the Assumed Liabilities; and (d) cash equal to the amount of the Accrued Payroll; provided, that, with respect to subsection (d), (x) Sellers shall deliver written notice to Purchaser of (A) its estimate of the portion of Accrued Payroll to be paid at least three (3) Business Days prior to the date upon which such portion of the Accrued Payroll becomes due and payable and (B) the actual Accrued Payroll by no later than 12:00 pm Central Time on the day that is one (1) Business Day prior to the date upon which such portion of the Accrued Payroll becomes due and payable, and (y) Purchaser shall pay cash to Sellers in the amount of the actual portion of such Accrued Payroll within twenty-four (24) hours of receipt of the notice described in subsection (B) above.

4.2    Allocation of Purchase Price. The Purchase Price will be allocated for Tax purposes among the Purchased Assets in accordance with Section 1060 of the Code, as determined by Purchaser after consultation with Sellers, and Purchaser shall deliver to Sellers the allocation within one hundred (100) days after Closing. The allocation shall be binding on Purchaser and Sellers for all purposes, including the reporting of gain or loss and determination of basis for income Tax purposes, and each of the Parties agrees that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state income Tax Returns and will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations that have been promulgated pursuant to Section 1060 of the Code and other similar applicable state Laws and regulations. Purchaser and Sellers shall not take any positions that are inconsistent with this allocation unless required to do so by applicable Law.

4.3    Cure Costs. Purchaser shall as promptly as reasonably practicable or thereafter upon assumption of the applicable Assumed Contract, pay all Cure Costs (subject to the Cure Costs Cap) associated therewith (if any).

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby represents and warrants to Purchaser, as of the date hereof and as of the Closing, as follows:

5.1     <u>Organization and Good Standing.</u>

(a)     CIS is a corporation duly organized, validly existing and in good standing under the laws of the State of Oklahoma.

(b)     CIS Treasury is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas.

(c)     Each Seller is, duly licensed or qualified to transact business and is in good standing in each jurisdiction in which the ownership of Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing (i) would not adversely affect the ability of a Seller to carry out its obligations under this Agreement or the Transaction Documents and to consummate the Transactions (including by delaying or impairing the consummation of the Transactions), or (ii) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business, the Purchased Assets or the Assumed Liabilities.

5.2     <u>Power; Authority; Enforceability</u>. Each Seller has full corporate or limited liability company power, as applicable, to: (a) own, lease and operate the Purchased Assets and carry on the Business as and where such assets are now owned or leased and as the Business is presently being conducted; and (b) execute, deliver and perform this Agreement, the Transaction Documents and all other agreements and documents to be executed and delivered by such Seller in connection herewith (the "***Seller Documents***"), subject to entry of the Sale Order and such authorization as may be required by the Bankruptcy Court (including satisfying any conditions imposed by the Bankruptcy Court) and compliance with all requirements of the Bankruptcy Code.  All requisite actions to approve, execute, deliver and perform this Agreement and the Seller Documents have been taken by Sellers.  This Agreement and each of the Seller Documents have been duly executed and delivered by such Seller and constitute binding obligations of such Seller, enforceable against each such Seller, in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting creditors' rights generally and by principles of equity.

5.3     <u>Title to Assets; Condition of Assets.</u>

(a)     Sellers have or will have as of immediately prior to the Closing good and valid title to, or, in the case of leased or subleased Purchased Assets (including the Leased Real Property), valid and subsisting leasehold interests in, all of the Purchased Assets, free and clear of all Liens (other than Pre-Petition Permitted Liens). Upon consummation of the Transactions at the Closing and subject to the entry of the Sale Order, each Seller will convey such title to or rights to use, all of the Purchased Assets, free and clear of all Liens (other than Assumed Liabilities and

Pre-Petition Permitted Liens) to Purchaser. Except for the Retained Assets, the Purchased Assets constitute all of the assets, rights, interests, claims and properties used in (to the extent Sellers hold rights, title and interest in such tangible personal property) or held for use in the conduct of the Business, or otherwise necessary for Purchaser to conduct and operate the Business immediately after the Closing in all material respects as presently conducted by Sellers. All tangible Purchased Assets are located on the Leased Real Property.

(b)     Except as set forth on Schedule 5.3(b), all of the buildings, equipment and other tangible personal property used in (to the extent a Seller holds rights, title and interest in such tangible personal property) or held for use in connection with the Business that are included as Purchased Assets, are in good operating condition and repair, free of defects and in a state of good maintenance, ordinary wear and tear excepted, in all material respects.

5.4     Noncontravention; Governmental Filings.

(a)     Subject to the entry of the Sale Order, the execution, delivery and performance by Sellers of this Agreement and the Transaction Documents and the consummation of the Transactions do not and will not (i) violate any Seller's Organizational Documents, (ii) assuming compliance with the matters referred to in the last sentence of this Section 5.4(b), to the Knowledge of Sellers, violate any applicable Law, (iii) violate, conflict with, constitute a breach or a default under (or event which, with the giving of notice or lapse of time, or both, would become a default) or give rise to any right of termination, amendment, revocation, suspension, payment, loss of benefit under, cancellation or acceleration of any Contract which constitutes a Purchased Asset or Assumed Liability, except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code or (iv) result in the creation or imposition of any Lien on any Purchased Asset, except for Pre-Petition Permitted Liens and Assumed Liabilities.

(b)     Subject to the entry of the Sale Order, the execution, delivery and performance by Sellers of this Agreement, the Transaction Documents and the consummation of the Transactions by Sellers does not require any action by or in respect of, notification to or filing with, any Governmental Authority other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

5.5     Litigation. Except as disclosed on Schedule 5.5, as of the date hereof, there are no Legal Proceedings pending against or, to the Knowledge of Sellers, threatened in writing against any Seller, or manager, director, officer or employee of any Seller involving, relating to or affecting, the Purchased Assets, Assumed Liabilities or the Business before any Governmental Authority which (a) if determined adversely to any such Seller would be, individually or in the aggregate, material with respect to the Purchased Assets, Assumed Liabilities or the Business, or (b) questions the validity of this Agreement, any Transaction Document or the Transactions, or in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions. Neither Seller nor, to the Knowledge of Seller, any manager, director, officer or employee of any Seller involved in the Purchased Assets, Assumed Liabilities or the Business, in his or her capacity as such, is, or since January 1, 2018 has been, a party to or in default with respect to any Order with respect to the Purchased Assets, Assumed Liabilities or the Business, other than any such Order where no injunctive or equitable relief was granted and where the monetary damages were covered by insurance.

5.6 <u>Permits</u>. <u>Schedule 5.6</u> sets forth a complete and correct list of all Permits required to own the Purchased Assets and conduct and operate the Business (including any Permits required by, or related to, Environmental Laws) in a manner consistent with the current practices of Sellers in the Ordinary Course of Business. Except as set forth on <u>Schedule 5.6</u>, (a) each Seller has obtained and is in material compliance with the terms and requirements of each Permit, (b) each such Permit is valid and is presently in full force and effect, and (c) no written notice of revocation, modification, refusal to renew or violation of any Permit has been received from any Governmental Authority and no Legal Proceeding is pending (or threatened) seeking to revoke, suspend, modify, cancel or limit any such Permit. <u>Schedule 5.6</u> identifies (i) with the demarcation "**" any Permit which is not transferable to Purchaser without the consent or approval of the issuing Governmental Authority, and (ii) with the demarcation "*" any Permit which requires that notice or disclosure be provided to the issuing Governmental Authority as a result of this Agreement or the Transactions.

5.7 <u>Intellectual Property Rights</u>.

(a) <u>Schedule 5.7(a)</u> sets forth all Transferred Intellectual Property Rights that are registered with any Governmental Authority or authorized registrar or for which an application for registration with any Governmental Authority or authorized registrar has been filed as of the date hereof, in each instance enumerating the applicable application number, registration number, title, date of filing, date of issuance, and owner (collectively, the "***Registered Transferred Intellectual Property Rights***"). To the Knowledge of Sellers, all Registered Transferred Intellectual Property Rights is subsisting and in full force and effect.

(b) <u>Schedule 5.7(b)</u> sets forth an accurate, true and complete list of all social media accounts, pages and profiles relating to or used in the Business (the "***Business Social Media Accounts***"). All Business Social Media Accounts are associated with a Seller company email address and, to the Knowledge of Seller, all login credentials (*e.g.*, user names and passwords) are under the sole control of only a Seller's employees.

(c) A Seller is the sole and exclusive legal, beneficial, and with respect to Registered Transferred Intellectual Property Rights, record owner of all right, title and interest in and to the Transferred Intellectual Property Rights, and has the valid and enforceable right to use all Licensed Intellectual Property, in each case, free and clear of all Liens (except for Pre-Petition Permitted Liens). To the Knowledge of Sellers, all of the Transferred Intellectual Property Rights are valid and enforceable, and constitute all of the Intellectual Property Rights owned, used or held for use by any Seller in connection with the Business or otherwise necessary to operate the Business as presently conducted by the Sellers (and as conducted in the Ordinary Course of Business). Neither the execution, delivery, or performance of this Agreement, nor the consummation of the Transactions, will result in the loss or impairment of or payment of any additional amounts with respect to, or require the consent of any other Person in respect of, Purchaser's right to own or use any Transferred Intellectual Property Rights or Licensed Intellectual Property in the conduct of the Business as currently conducted. Immediately following the Closing, all Transferred Intellectual Property Rights and Licensed Intellectual Property will be owned or available for use by Purchaser on substantially the same terms as they were owned or available for use by the Sellers immediately prior to the Closing.

- 25 -

(d)     Except as disclosed on Schedule 5.7(d), to the Knowledge of Sellers, (i) the conduct of the Business by Sellers as currently conducted (including the products and services sold or provided by Sellers) does not infringe, misappropriate or otherwise violate any Person's Intellectual Property Rights, and no such claims are pending or threatened in writing against any Seller, and (ii) no Person is infringing, misappropriating or otherwise violating any Intellectual Property Rights included in the Purchased Assets, and no such claims are pending or threatened in writing against any Person by any Seller.

(e)     Neither any Seller nor, to the Knowledge of Sellers, any other party to any material IP Contract is, or is alleged to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal) or to withhold its consent in connection with a transfer to Purchaser (as required pursuant to the Transactions) of, any material IP Contract.

(f)     To the Knowledge of Sellers, (i) no Seller has experienced any material failures, disruptions, unauthorized intrusions or breaches of its information technology or telecommunications networks, nor any material loss, theft or unauthorized access to or use of any Personal Information held by or on behalf of such Seller, and (ii) each Seller has implemented industry standard security measures to protect the security of its information technology and telecommunications networks and systems and the privacy and security of any material data or Personal Information stored thereon.

5.8     Compliance with Laws. Each Seller is, and for the past six (6) years has been, in compliance and has not been in violation of any Law applicable to the Purchased Assets, the Assumed Liabilities or the conduct of the Business, except for violations or instances of non-compliance, which do not or would not reasonably be expected to have, individually or in the aggregate, a material and adverse effect on any of the Business, the Purchased Assets or the Assumed Liabilities.

5.9     Employees.

(a)     Schedule 5.9 sets forth a complete and correct list of all Business Employees and other service providers as of the date hereof, including each Business Employee's or service provider's (i) annual compensation or rate of pay, target incentive compensation opportunity and frequency of incentive compensation payments, each as applicable (as of the date hereof), (ii) employment agreement (if any), (iii) employment location (city and state), (iv) title or employment position, (v) date of hire or, if applicable, date of rehire, (vi) applicable paymaster/payroll entity, and (vii) the amount of accrued but unused vacation or paid time off as of the date hereof, with each such individual identified as (A) salaried or hourly, (B) exempt or nonexempt, (C) union or nonunion, (D) full-time or part-time, (E) temporary, regular or leased/staffing agency and (F) active or inactive (with the reason for such inactive status specified, *e.g.*, leave of absence, FMLA, disability, layoff, etc.).

(b)     (i) Neither Sellers nor any of their respective Affiliates is, or has ever been, a party to or bound by any union collective bargaining agreements or other labor contracts covering any Business Employee or other service provider, there are no unions or similar labor organizations representing or purporting to represent or, to the Knowledge of Sellers, attempting to represent,

any Business Employee or other service provider and no Business Employee or other service provider is attempting, or has attempted, to form a union or similar labor organization; (ii) neither Sellers nor any of their respective Affiliates are experiencing or have experienced in the three (3) years prior to the date of this Agreement, any material labor disputes or work stoppages due to labor disputes in connection with their business and operations and there is not currently, and has not been in the three (3) years prior to the date of this Agreement, any labor strike, dispute, slow down or stoppage actually pending or, threatened against Sellers or any of their respective Affiliates; (iii) neither Sellers nor any of their respective Affiliates have in the three (3) years prior to the date of this Agreement engaged in any unfair labor practices within the meaning of the National Labor Relations Act with respect to its employees or other individuals who provide services that support the business and operations; (iv) neither Sellers nor any of their respective Affiliates have (A) in the ninety (90) days preceding the date of this Agreement implemented any mass layoffs, plant closings or shutdowns as defined under the WARN Act or (B) incurred any liability or obligation under the WARN Act that remains unpaid or unsatisfied; (v) there are no pending employment discrimination, employee health and safety, unfair labor practice, wage and hour, unemployment compensation, worker's compensation, immigration, union grievance or other employment-related claims, citations, proceedings or, to the Knowledge of Sellers, investigations or allegations against Sellers or any of their respective Affiliates; and (vi) Sellers and their respective Affiliates have complied in all material respects with all applicable legal requirements relating to employment and employment practices, including all legal requirements respecting terms and conditions of employment, wages, hours, classification of employees, including for minimum wage, overtime, and independent contractor purposes, discrimination in employment, immigration, occupational health and safety, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations and collective bargaining and are not liable for any arrears of wages or any Taxes or penalties for failure to comply with any of the foregoing. To the Knowledge of Sellers, in the last four (4) years, no allegations of sexual or other unlawful harassment or discrimination have been made against (A) any officer of Sellers or any of their respective Affiliates or (B) any Business Employee or other service provider. Sellers and their respective Affiliates have correctly classified each of its respective service providers as "employees" or "independent contractors" and as "exempt" or "non-exempt" for all purposes and has properly reported all compensation paid to such service providers for all purposes.

5.10    Employee Benefit Plans.

(a)    Schedule 5.10(a) contains a complete and accurate list of all Seller Plans. Sellers have provided to, or made available to, Purchaser true, correct and complete copies of each Seller Plan (including all plan documents and amendments thereto) including (i) each plan document, and in the case of an unwritten plan, a written description thereof, (ii) all current trust documents, investment management contracts, custodial agreements and insurance contracts relating thereto, (iii) the current summary plan description and each summary of material modifications thereto, (iv) the most recently filed annual report (Form 5500 and all schedules thereto), (v) the most recent Internal Revenue Service determination or opinion letter, (vi) the most recent summary annual report, actuarial report, financial statement and trustee report, (vii) the most recent nondiscrimination tests required to be performed under the Code and (viii) any material correspondence with a Governmental Authority. There are no pending or, to the Knowledge of

Sellers, threatened claims, litigation or other proceedings with respect to any Seller Plan, other than ordinary and usual claims for benefits by participants and beneficiaries.

(b)  Each Seller Plan (and any related trust or other funding vehicle) has been established, maintained, funded, operated and administered in material compliance with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws and there has been no written notice issued by any Governmental Authority questioning or challenging such compliance, and there are no audits, examinations, investigations or other legal proceedings (other than non-material routine claims for benefits) pending, or, to the Knowledge of Sellers, threatened, involving any such Seller Plan or the assets of any such Seller Plan.  Except as could not be reasonably expected to result in any material liability, no Seller Plan is subject to any audit, investigation, or examination by any Governmental Authority and no such actions are pending or, to the Knowledge of Sellers, threatened with respect to any Seller Plan.

(c)  Each Seller Plan which is intended to be qualified within the meaning of Code Section 401(a) is so qualified and has received, or timely requested, a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and its trust is exempt from federal taxation under Code Section 501(a), and to the Knowledge of Sellers, no event has occurred and no facts or conditions exist that would reasonably be expected to adversely affect the qualified status of any such Seller Plan or result in the imposition of any liability, penalty or Tax under ERISA, the Code or other applicable Law.  No "prohibited transaction," within the meaning of Section 4975 of the Code or Sections 406 and 407 of ERISA, or breach of fiduciary duty has occurred with respect to any Seller Plan. None of the Sellers nor any of their respective ERISA Affiliates has any liability (whether or not assessed) under Sections 4980D, 4980H, 6721 or 6722 of the Code.

(d)  Except as set forth on Schedule 5.10(d), none of Sellers or any of their respective ERISA Affiliates maintains, sponsors, contributes to or is required to contribute to, or has ever maintained, sponsored, contributed to or been required to contribute to: (i) any Multiemployer Plan, (ii) any pension plan subject to Title IV of ERISA, Part 3 of Title I of ERISA or Section 412 of the Code, (iii) any "multiple employer plan" as defined in Section 413(c) of the Code, (iv) any "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA, (v) a voluntary employee benefit association under Section 501(c)(9) of the Code, or (vi) any plan which provides, or under which Sellers or any of their respective ERISA Affiliate thereof has any liability to provide, retiree or post-employment life insurance, medical, severance or other employee welfare benefits to any participant, except as required by Section 4980B of the Code or any similar applicable Law and at the sole expense of the applicable participant.

(e)  None of Sellers or any of their respective ERISA Affiliates sponsors, maintains, or contributes to, or otherwise has any liability with respect to, any Seller Plan that may not be terminated by Sellers or any of their respective ERISA Affiliates in their sole discretion at any time without material liability.

(f)  Neither the execution nor the delivery of this Agreement or any other document related to the Transaction or other agreement by Sellers or their respective Affiliates nor the consummation of the Transactions, either alone or in combination with another event, will

- 28 -

(i) entitle any Business Employee or other service provider to any payment; (ii) increase the amount of compensation or benefits due to any Business Employee or other service provider; (iii) accelerate the vesting, funding or time of payment of any compensation, equity award or other benefits; (iv) result in any obligation or other liability to or obligation or commitment by Purchaser or any of its Affiliates to any Business Employee or other service provider; or (v) give rise to payments or benefits that, separately or in the aggregate, could be nondeductible to the payor under Section 280G of the Code or would result in an excise Tax on any recipient under Section 4999 of the Code. No current or former Business Employee or other service provider of the Sellers has a right to receive a gross-up payment with respect to any excise Taxes that may be imposed upon such individual pursuant to Code Section 409A, Code Section 4999 or otherwise.

5.11    Real Property.

(a)    The Leased Real Property constitutes all of the real property (whether leased, subleased or licensed) used by Sellers in connection with the Business.  Sellers do not own, nor have they ever owned, any real property which is used in connection with the Business.

(b)    Schedule 5.11(b) lists each lease or sublease, including all amendments, modifications or supplements thereof, pursuant to which a Seller occupies any Leased Real Property (collectively, the "**Real Property Leases**").  Sellers have delivered (or otherwise made available) to the Purchaser a true, correct and complete copy of each Real Property Lease, in each case, as amended or otherwise modified and in effect, together with extension notices, lease summaries, notices or memoranda of lease, estoppel certificates and subordination, non-disturbance and attornment agreements related thereto.

5.12    Contracts.

(a)    Schedule 5.12(a) sets forth a list of (i) all executory Contracts and (ii) all other Contracts that are material to the Business, including the Real Property Leases, to which any Seller is a party or by which any Seller, the Business or the Purchased Assets are bound or to which the Assumed Liabilities relate, including any Contract under which any Seller continues to have any obligation or liability as of the date of this Agreement, and Sellers' good faith estimate of the Cure Costs associated with each. Sellers have made available to Purchaser or its representatives true, complete and correct copies of all material Contracts (including any amendments thereto).

(b)    Other than the obligation to pay Cure Costs (if any) set forth on Schedule 5.12(a), or as a result of (i) rejection by Sellers in the Bankruptcy Cases, (ii) the automatic stay under the Bankruptcy Code, (iii) any consequence of any of the foregoing, and except as set forth on Schedule 5.12(b), with respect to each such Contract no Seller that is party thereto, as applicable, or, to the Knowledge of Sellers, any third party is in default or breach with respect to any obligation to be performed under any such material Contract, except for any breach or default, individually or in the aggregate, that would not reasonably be expected to be material to the Business, the Purchased Assets, or the Assumed Liabilities. Each such Contract is valid, binding and in full force and effect, enforceable against all applicable Sellers and, to the Knowledge of Sellers, enforceable against the other party or parties thereto, in each case, in accordance with the terms thereof (except (A) as enforcement may be limited by applicable bankruptcy, receivership, insolvency, reorganization, moratorium, fraudulent conveyance, equitable subordination or similar

Laws of general application and other Laws affecting creditors' rights generally and (B) insofar as the availability of equitable remedies may be limited by applicable Law).

5.13    Environmental Matters.

(a)    Except as set forth on Schedule 5.13(a), Sellers are, and for the past six (6) years have been, in compliance, in all material respects with all applicable Environmental Laws with respect to the Leased Real Property, the Business and the Purchased Assets. No Seller is the subject of any outstanding material liability in respect of any actual or alleged violations of Environmental Laws or any actual or alleged release of a Hazardous Substances with respect to the Leased Real Property, the Business and/or the Purchased Assets. The Sellers have obtained all Permits required under all applicable Environmental Laws necessary to operate the Business and to own, lease or operate the Purchased Assets, subject to renewal of such Permits in the Ordinary Course of Business.

(b)    Except as set forth on Schedule 5.13(b), no Seller has received written notice or other communication from any Governmental Authority or other Person, or been the subject of any Legal Proceeding, in each case, alleging material liability arising under Environmental Law or relating to any Hazardous Substance with respect to the Leased Real Property, the Business or the Purchased Assets, including any obligation of any Seller to undertake or bear the cost of any investigation, corrective action, remediation or monitoring with respect to the Leased Real Property, any off-site disposal facility or other property used in connection with the Business, the Business or the Purchased Assets, in each case, which remains unperformed, outstanding or unresolved.  To the Knowledge of Sellers, no such Legal Proceeding is threatened with respect to the Leased Real Property, the Business, the Assumed Liabilities, the Purchased Assets or any real property previously owned, leased, subleased, occupied operated or otherwise used by any Seller in connection with the Business.

(c)    No Seller has retained or assumed by Contract or operation of Law, any liability of (or other obligation with respect to) any third party under any Environmental Law.

5.14    Insurance. Schedule 5.14 sets forth a true and complete list of the insurance policies (collectively, the "**Insurance Policies**") maintained by each Seller that cover (or relate to) the Business, the Purchased Assets and/or the Assumed Liabilities. Each of the Insurance Policies are in full force and effect and all premiums due thereon as of the date hereof have been paid. Except as set forth on Schedule 5.14, there are no claims, by or with respect to any Seller pending under any of the Insurance Policies or disputes with insurers with respect thereto. Sellers have made available to Purchaser true, complete and accurate copies of all Insurance Policies. Sellers have not received any written notice of cancellation or non-renewal of, or material reduction of coverage with respect to, any such Insurance Policy.

5.15    Occupational Safety and Health Matters.  Except as set forth on Schedule 5.15:

(a)    Each Seller and the Business is, and for the past six (6) years has been, in compliance in all material respects with all applicable Occupational Safety and Health Laws, and no reason exists why any Seller or the Business would not be capable of continued operation of

the Business in compliance with applicable Occupational Safety and Health Laws without undue expense or burden.

(b)     No Seller has received any written notice or other communication from any Governmental Authority or any other Person regarding (i) any failure to comply in any material respect with any applicable Occupational Safety and Health Law or (ii) any obligation to undertake or bear any cost of any material Occupational Safety and Health Liabilities, in connection with the Leased Real Property, the Business and the Purchased Assets, and to the Knowledge of Sellers, there are no facts or circumstances that can be reasonably expected to form the basis of any of the foregoing.

(c)     Sellers have made available to Purchaser copies of any occupational health and safety assessments, audit reports or similar studies or analyses relating to the Business, and Leased Real Property that has been prepared on behalf of any Seller (or its Affiliates) in the past six (6) years.

5.16     <u>Taxes</u>.

(a)     Each Seller has timely filed all Tax Returns in respect of the Business and/or the Purchased Assets required to be filed with the appropriate Governmental Authority.  All such Tax Returns are true, complete and correct in all respects and were prepared in compliance with all applicable Laws.  All Taxes relating to the Business and/or the Purchased Assets that are due and payable, whether or not shown to be payable on such Tax Returns, have been or will be timely paid before or at the Closing. Except as set forth on <u>Schedule 5.16(a)</u>, no examination of any such Tax Return is currently in progress by any Governmental Authority and no Seller has received written notice (or, to the Knowledge of Sellers, oral notice) of any contemplated examination of any such Tax Return and no adjustment has been proposed in writing (or, to the Knowledge of Sellers, orally) with respect to any such Tax Returns by any Governmental Authority.

(b)     Except as set forth on <u>Schedule 5.16(b)</u>, no Seller has agreed to any waiver or extension of any statute of limitations in respect of Taxes with respect to the Business and/or the Purchased Assets.  There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other Legal Proceedings for or relating to any liability for Taxes relating to the Business and/or the Purchased Assets.

(c)     No Seller is a party to any "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local, or foreign Law) or any other agreement with any Governmental Authority with respect to Taxes and with respect to the Business and/or the Purchased Assets. No private letter ruling, technical advice memoranda or similar rulings have been requested or issued by any Governmental Authority with respect to any of the Sellers.

(d)     No Seller is in default under, nor does there exist any condition which, with the giving of notice or passage of time, would constitute a default by any Seller under any agreement with any Governmental Authority that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive.

(e)     Each Seller has withheld and timely paid and timely deposited all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party (in each case, with respect to the Business and/or the Purchased Assets) and all IRS Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely filed and properly and timely distributed.

(f)     No Seller is a party to any Tax allocation, indemnification or sharing agreement. No Seller (i) has been a member of an affiliated group filing a consolidated federal income Tax Return, or (ii) has any liability for the Taxes of any Person under Treasury Regulation 1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by Contract, or otherwise.

(g)     No Seller is or has been a party to any "listed transaction," as defined in Section 6707A(c)(2) of the Code and Treasury Regulation 1.6011-4(b)(2).

(h)     There are no Liens for Taxes on the Purchased Assets.

(i)     No claim has been made in writing by any Governmental Authority in a jurisdiction where a Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction with respect to the Business and/or Purchased Assets.

(j)     No power of attorney with respect to Taxes has been executed or filed with any Governmental Authority by or on behalf of any Seller that will remain in effect after the Closing Date.

(k)     Each Seller has, with respect to the Business and/or the Purchased Assets, properly (i) collected and remitted sales and similar Taxes with respect to sales made to its customers, and (ii) for all sales that are exempt from sales and similar Taxes that were made without charging or remitting sales or similar Taxes, received and retained any appropriate Tax exemption certificates and other documentation qualifying such sale as exempt.

5.17     Material Customers; Material Suppliers.

(a)     Schedule 5.17(a)(i) sets forth a list of the top ten (10) customers of the Business by dollar volume of revenue received by the Sellers for each of (a) the eleven (11) month period ended on November 30, 2022, and (b) the twelve (12) month period ended on December 31, 2021, as well as the corresponding dollar volumes for such periods (collectively, the "**Material Customers**"). In the last three (3) years, no Seller nor any of its Affiliates has received any notice from any Material Customer that any such Material Customer has or may stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to its purchase of products or services from the Business, whether as a result of the consummation of the Transactions or otherwise, nor during the last twelve (12) months has any Material Customer canceled, materially modified, or otherwise terminated (or threatened in writing (or to the Knowledge of Sellers, orally) to do the same) its relationship with the Business or materially decreased its purchase of products or services (or threatened to do the same) from the

Business.  Except as set forth on Schedule 5.17(a)(ii), there are no disputes between any Seller (or the Business), on the one hand, and any Material Customer, on the other hand.

(b)     Schedule 5.17(b)(i) sets forth a list of the top ten (10) suppliers of the Business by dollar volume of expenses paid by the Sellers for each of (a) the eleven (11) month period ended on November 30, 2022, and (b) the twelve (12) month period ended on December 31, 2021, as well as the corresponding dollar volumes for such periods (collectively, the "**Material Suppliers**").  In the last three (3) years, no Seller nor any of its Affiliates has received any notice from any Material Supplier that any such Material Supplier has or may stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to supplying materials, products or services to the Business, whether as a result of the consummation of the Transactions or otherwise, nor during the last twelve (12) months has any Material Supplier canceled, materially modified, or otherwise terminated (or threatened in writing (or to the Knowledge of Sellers, orally) to do the same) its relationship with the Business and materially decreased its services, supplies or materials (or threatened to do the same) to the Business.  Except as set forth on Schedule 5.17(b)(ii), there are no disputes between Seller (or the Business), on the one hand, and any Material Supplier, on the other hand.

5.18    Affiliated Transactions.  Except as set forth on Schedule 5.18, to the Knowledge of Sellers, no Related Party nor the Sponsor (a) is a party to any Contract or transaction involving the Business other than (i) loans and other extensions of credit to directors and officers of a Seller (and/or the Business) for travel or business expenses or other employment-related purposes in the Ordinary Course of Business, none of which are material, individually or in the aggregate, and (ii) employment arrangements, or (b) owns, directly or indirectly, any interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a material customer, supplier, lessor, lessee, competitor of the Business, or any other Person with a material commercial relationship with the Business.

5.19    Brokers or Finders.  Except as set forth on Schedule 5.19, Sellers have not entered into any agreement or arrangement to pay any commission, brokerage, finder's fee or other similar compensation arrangement or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

5.20    No Implied or Other Representations or Warranties.  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO THAT SELLERS AND ANY OF THEIR RESPECTIVE AFFILIATES AND THE SPONSOR ARE NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OR REPRESENTATION AS TO CONDITION, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO ANY OF THE PURCHASED ASSETS, AND IT IS UNDERSTOOD THAT EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, PURCHASER TAKES ALL OF SUCH PROPERTIES AND ASSETS ON AN "AS IS" AND "WHERE IS" BASIS.  NEITHER SELLERS NOR ANY STOCKHOLDERS, MEMBERS, EMPLOYEES, MANAGERS, DIRECTORS, OFFICERS OR REPRESENTATIVES OF SELLERS HAVE MADE, AND SHALL NOT BE DEEMED TO

- 33 -

HAVE MADE, ANY REPRESENTATIONS OR WARRANTIES IN ANY PRESENTATION OF THE BUSINESS OF SELLERS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREIN, AND NO STATEMENT MADE IN ANY SUCH PRESENTATION SHALL BE DEEMED A REPRESENTATION OR WARRANTY HEREUNDER OR OTHERWISE. IT IS EXPRESSLY UNDERSTOOD THAT ANY COST ESTIMATES, PROJECTIONS, PREDICTIONS OR FORWARD-LOOKING STATEMENTS CONTAINED IN ANY DATA, FINANCIAL INFORMATION, MEMORANDA OR OFFERING MATERIALS OR PRESENTATIONS ARE NOT AND SHALL NOT BE DEEMED TO BE OR INCLUDE PRESENTATIONS OR WARRANTIES OF SELLERS OR OF ANY STOCKHOLDER, MEMBER, EMPLOYEE, MANAGER, DIRECTOR, OFFICER, OR REPRESENTATIVE OF SELLERS.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers, as of the date hereof and as of the Closing, as follows:

6.1     Organization and Good Standing. Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

6.2     Power; Authority; Enforceability. Purchaser has all requisite limited liability power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transactions contemplated hereby and thereby (collectively, the "**Purchaser Documents**"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly and validly authorized by all necessary action on behalf of Purchaser, including approval of its member necessary for it to validly execute and deliver, this Agreement and each Purchaser Document. This Agreement has been, and each Purchaser Document will be at or prior the Closing, duly and validly executed and delivered by the Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a legal proceeding at law or in equity). None of the execution and delivery by Purchaser of this Agreement and the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of the Organizational Documents of Purchaser.

6.3     Consents.

(a)     Purchaser is not required to obtain any consent, approval, authorization, waiver, Order or Permit of or from, or to make any declaration or filing with, or to give any

notification to, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for (i) approvals under applicable Laws, if any, and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not have a Material Adverse Effect on the Business or would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the Transactions.

(b)     The execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the Transactions by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will not conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any Contract or Permit to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the Transactions.

6.4     No Conflicts. No action taken by or on behalf of Purchaser in connection herewith, including, but not limited to, the execution, delivery and performance of this Agreement, and each other agreement and document delivered by it in connection herewith, and consummation of the Transactions, (a) gives rise to a right of termination or acceleration under any Contract to which Purchaser is a party or by which Purchaser is bound; (b) conflicts with or violates (i) any Law; (ii) Purchaser's Organizational Documents; or (iii) any Order to which Purchaser is subject; or (c) constitutes an event which, after notice or lapse of time or both, could result in any of the foregoing, except as would not, individually or in the aggregate, reasonably be expected to prevent or materially delay Purchaser's ability to consummate the Transactions.

6.5     Litigation. There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened in writing against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions. Purchaser is not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to consummate the Transactions.

6.6     Brokers or Finders. Purchaser has not entered into any agreement or arrangement to pay any commission, brokerage, finder's fee or other similar compensation arrangement or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees or other similar fees in connection with this Agreement or the Transactions.

6.7     No Implied or Other Representations or Warranties. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO THAT NEITHER PURCHASER AND ANY OF ITS AFFILIATES (NOR ANY STOCKHOLDERS, MEMBERS, EMPLOYEES, MANAGERS, DIRECTORS, OFFICERS OR

REPRESENTATIVES) ARE MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS AGREEMENT BY PURCHASER.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1    <u>Conditions to Obligations of All Parties</u>. The obligation of each Party to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by each Party:

(a)    The Bankruptcy Court shall have entered the Bid Procedures Order.

(b)    The Bankruptcy Court shall have entered the Sale Order and such order has become a Final Order.

(c)    There shall be no preliminary or permanent injunction, stay or similar Order of any nature which is in effect and has the effect of making the Transactions illegal or otherwise restraining, enjoining, staying or prohibiting consummation of the Transactions.

(d)    There shall not be in effect any Law restraining, enjoining, or prohibiting the consummation of the Transactions.

7.2    <u>Conditions to Purchaser's Obligations</u>. The obligation of Purchaser to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived (to the extent legally waiveable) by Purchaser:

(a)    (i) Each of the Seller Fundamental Representations shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such Seller Fundamental Representations speak as of an earlier date, they shall be true and correct in all respects as of such earlier date) and (ii) all other representations and warranties of Sellers contained in this Agreement or any Transaction Document (but disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein) shall be true and correct in all respects at and as of the date hereof and as of the Closing Date as though made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), except where the failure of such representations and warranties which are the subject of this <u>clause (ii)</u> to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Each Seller shall have performed and complied in all material respects with all of the covenants, obligations and agreements of such Seller required by this Agreement to be performed or complied with by such Seller on or prior to the Closing Date.

(c)    Since the date of this Agreement, there shall not have occurred any Material Adverse Effect.

(d)     All Permits set forth on <u>Schedule 2.1(g)</u> shall have been transferred to Purchaser as legal and beneficial holder thereof, or, if any Permit is not transferable, a replacement permit or license (as applicable), on substantially similar terms shall have been issued to Purchaser.

(e)     Each Seller shall have delivered to, or caused to be delivered to, Purchaser the following documents, duly executed by such Seller (where appropriate):

(i)     A duly executed counterpart of each Bill of Sale and Assignment and Assumption Agreement;

(ii)     A certificate, dated as of the Closing Date and signed by an authorized officer of such Seller, certifying (A) that the conditions contained in <u>Sections 7.2(a)</u> and <u>(b)</u> have been satisfied, (B) that attached thereto are true and complete copies of all resolutions adopted by the board of directors or managers, as applicable, of such Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby and (C) the names and signatures of the officers of such Seller authorized to sign this Agreement and the other documents to be delivered hereunder;

(iii)     An executed IRS Form W-9 from each Seller;

(iv)     A copy of the Sale Order;

(v)     A duly executed counterpart of the Transition Services Agreement; and

(vi)     Such other document(s) or instruments as may be reasonably required or otherwise requested by Purchaser to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement;

(f)     Cash, in an amount equal to the Wind Down Amount, shall be retained in an account designated by Sellers, which is a Retained Asset.

(g)     Prior to, or concurrently with, the consummation of Transactions, each of the Related Company Acquisitions shall have been consummated.

(h)     The Cure Costs shall not be in excess of the Cure Costs Cap.

(i)     The Post-Petition Payables shall not be in excess of the Post-Petition Assumed Liabilities Cap.

(j)     The Transfer Taxes shall not be in excess of the Transfer Taxes Cap.

(k)     The Accrued Payroll shall not exceed the Accrued Payroll Cap.

7.3     <u>Conditions to Sellers' Obligations</u>. The obligation of each Seller to consummate the Transactions on the Closing Date is subject to the fulfillment on or prior to the Closing Date

of the following conditions, any one or more of which may be waived (to the extent waiveable) by Sellers:

(a)    (i) Each of the Purchaser Fundamental Representations shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such Purchaser Fundamental Representations speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), and (ii) all other representations and warranties of Purchaser contained in this Agreement or the Transaction Documents (but disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein) shall be true and correct in all respects at and as of the date hereof and as of the Closing Date as though made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), except for such failure to be so true and correct that, individually or in the aggregate, has not had, or would not reasonably be expected to have, a material adverse effect on the ability of Purchaser to consummate, or would not otherwise materially impair or prevent Purchaser from consummating, the Transactions.

(b)    Purchaser shall have performed and complied in all material respects with all of Purchaser's covenants, obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

(c)    Purchaser shall deliver a payoff letter, release letter or other similar document acknowledging the conversion of the Credit Bid Amount as consideration for the transfer of the Purchased Assets.

(d)    Purchaser shall have delivered to, or caused to be delivered, to Sellers the following documents, duly executed by Purchaser (where appropriate):

(i)    A duly executed counterpart of each Bill of Sale and Assignment and Assumption Agreement;

(ii)    A duly executed counterpart of the Transition Services Agreement;

(iii)    Purchaser or its parent (the "**MIP Issuer**") shall have established a management incentive plan effective as of and conditioned upon the consummation of the Closing (the "**Post-Emergence Incentive Plan**")  providing for the issuance of up to 15% (increasing to 20% if certain performance targets are met) of the fully diluted common equity of the MIP Issuer in the form of restricted stock, options or other equity or equity-based instruments to certain employees of the MIP Issuer and its subsidiaries (including Transferred Employees and employees of the Encompass Services, LLC, Perennial Environmental I, LLC and Applied Consultants, Inc. businesses to be acquired by the MIP Issuer), it being understood that the MIP Issuer will select the participants in the Post-Emergence Incentive Plan in its sole discretion and that the terms of the Post-Emergence Incentive Plan shall be subject to approval by the board of the MIP Issuer and the applicable plan document and individual award agreements thereunder.

(iv)    A certificate, dated the Closing Date and signed by an authorized officer of Purchaser, certifying (A) that the conditions contained in <u>Sections 7.3(a)</u> and <u>(b)</u> have been satisfied, (B) that attached thereto are true and complete copies of all resolutions required by the organizational documents of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the Transactions, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby and (C) the names and signatures of the officers of Purchaser authorized to sign this Agreement and the other documents to be delivered hereunder; and

(v)    Such other document(s) or instruments as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

## ARTICLE VIII
## COVENANTS

8.1    <u>Conduct of the Business</u>.

(a)    From the date hereof until the earlier of the termination of this Agreement pursuant to <u>Section 9.2</u> and the Closing Date, except as expressly set forth on <u>Schedule 8.1(a)</u>, Sellers agree to: (i) conduct the Business (including the operation thereof) in the Ordinary Course of Business; (ii) use commercially reasonable efforts to preserve the goodwill and present business relationships (contractual or otherwise) with all customers, suppliers, resellers, employees, licensors, distributors and others having business relationships with the Business; (iii) use commercially reasonable efforts to keep available the services of the Business' current officers, directors, employees and consultants; (iv) use commercially reasonable efforts to preserve and maintain (consistent with past practice) in all material respects the Business' present properties and its tangible and intangible assets (including all of the Purchased Assets); (v) comply in all material respects with all applicable Laws and material Contracts used in or otherwise related to the Business; (vi) withhold, pay and deposit as required all applicable Taxes as such Taxes become due and payable; and (vii) maintain all existing Permits.

(b)    From the date hereof until the earlier of the termination of this Agreement pursuant to <u>Section 9.2</u> and the Closing Date, except (i) in the Ordinary Course of Business, (ii) as required by applicable Law, (iii) as required by the Bankruptcy Court or this Agreement, (iv) as disclosed on <u>Schedule 8.1(b)</u>, or (v) with the prior written consent of Purchaser, Sellers will not:

(i)    acquire a material amount of assets from (or the equity interests of) any other Person, or sell, lease, license, transfer, encumber or otherwise dispose of any Purchased Assets;

(ii)    modify, amend, supplement or terminate any Assumed Contract;

(iii)    fail to maintain and keep in full force and effect all existing insurance policies for the benefit of the Business or the Purchased Assets (including the Insurance Policies), other than such insurance policies that expire by their terms (in which

event Sellers shall use reasonable best efforts to renew or replace such insurance policies) or changes to such insurance policies made in the Ordinary Course of Business;

(iv)     except to the extent required by the terms of the applicable Seller Plan as in effect on the date hereof (excluding any discretionary actions permitted under any Seller Plan), (i) increase the salary, bonus or severance arrangements of any employee or other service provider receiving annualized total compensation of $150,000 or more; (ii) adopt, enter into, amend or terminate any Seller Plan (including any employee benefit plan or arrangement which would be a Seller Plan if entered into as of the date hereof); (iii) exercise any discretion to accelerate the vesting or payment of any compensation or benefit under any Seller Plan; (iv) grant any loan to, increase the compensation or benefits of or pay any material bonus to any Business Employee or other service provider; (v) grant any severance, change of control, retention, termination or similar compensation or benefits to any Business Employee or other service provider; (vi) pay to any Business Employee or other service provider any benefit or amount not required under any Seller Plan as in effect on the date of this Agreement; (vii) hire or terminate the employment of any Business Employee or other service provider receiving annualized total compensation of $150,000 or more; (viii) transfer the employment of any employee or other service provider from a status in which such employee would have been a Business Employee to a status in which such employee will not be a Business Employee; or (ix) transfer the employment of any employee from a status in which such employee would not have been a Business Employee to a status in which such employee will be a Business Employee;

(v)     make, revoke or change any Tax election, file any amended Tax Return, revoke or change any Tax accounting method, enter into any closing agreement within the meaning of Section 7121 of the Code, request any Tax ruling with or from a Governmental Authority, surrender any right to claim a Tax refund, offset or other reduction in Tax liability, consent to any extension or waiver of limitations period applicable to any Tax claim or assessment, or settle any Tax proceeding;

(vi)     change any financial accounting policies or procedures or any methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable Law;

(vii)     (A) materially accelerate collection of notes or Accounts Receivable in advance of their regular due dates or the dates when the same would have been collected in the Ordinary Course of Business; (B) materially delay or accelerate payment of any account payable in advance of its due date or the date such liability would have been paid in the Ordinary Course of Business; (C) make any material changes to cash management policies; or (D) materially delay or postpone the repair or maintenance of the Purchased Assets (including any of the Leased Real Property).

(viii)     adopt any amendments to the Organizational Documents of any Seller;

(ix)     form any new subsidiary of any Seller;

(x)  waive, release, assign, settle or compromise any material pending or threatened Legal Proceeding;

(xi)  demolish or remove any Improvement on the Leased Real Property or erect Improvements on the Leased Real Property or any portion thereof;

(xii)  make or enter into any new commitment for capital expenditures (except as permitted pursuant to the DIP Facility);

(xiii)  subject any of the Purchased Assets to any Lien, except for permitted post-petition liens and any Lien secured and granted pursuant to the DIP Order or a cash collateral order;

(xiv)  take any action with respect to the Purchased Assets, the Assumed Liabilities or the Business relating to, as a result of, or on the basis of, the COVID-19 pandemic, except to the extent required by applicable Law;

(xv)  take any action that would reasonably be expected to cause the failure of any condition contained in <u>Section 7.2</u> (other than actions taken by Sellers in connection with the discharge of their fiduciary duties during the Bankruptcy Cases); or

(xvi)  agree or commit to do any of the foregoing.

8.2  <u>Access</u>. From the date hereof until the Closing Date, Sellers shall provide Purchaser and its representatives reasonable access, during normal business hours upon reasonable advance notice, to Sellers' personnel, facilities and all books and records and such other information and Persons relating to the Business as Purchaser may reasonably request in such a manner as not to interfere with the conduct of the Business.  Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to disclose any information to Purchaser if such disclosure would (a) jeopardize any attorney-client or other privilege; or (b) contravene any applicable Law.

8.3  <u>Bankruptcy Court Matters</u>.

(a)  <u>Bankruptcy Court Filings</u>.

(i)  <u>Sale Order and Bidding Procedures Order</u>. Sellers shall seek entry of the Sale Order, the Bidding Procedures Order, and any other necessary orders by the Bankruptcy Court to consummate the Closing as soon as reasonably practicable following the execution of this Agreement. Purchaser and Sellers understand and agree that the Transaction is subject to approval by the Bankruptcy Court. Purchaser and Sellers acknowledge that to obtain such approval and to satisfy the Sellers' fiduciary duties to all applicable stakeholders in accordance with applicable Law, the Sellers must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, and that such demonstration shall include giving notice of the Transactions to creditors and other interested parties as ordered by the Bankruptcy Court and, if necessary, conducting the Auction (as defined in the Bidding Procedures Order). Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and Bidding Procedures Order,

including a finding of adequate assurance of future performance by Purchaser, and furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal, and Purchaser shall cooperate in such efforts.

(ii)      Sellers shall file such motions or pleadings as may be appropriate or necessary to: (A) assume and assign the Assumed Contracts, and (B) subject to the consent of the Purchaser, determine the amount of the Cure Costs; provided that nothing herein shall preclude Sellers, subject to Purchaser's prior written consent, from filing such motions to reject any Contracts or Leases that are not listed on Schedule 2.1(f) or that have been designated for rejection by Purchaser.

(iii)      Sellers shall (A) consistent with their respective obligations as fiduciaries under the Bankruptcy Code, cooperate with Purchaser concerning the Bidding Procedures Order, the Sale Order, and any other orders of the Bankruptcy Court relating to the transactions contemplated by this Agreement, and (B) use commercially reasonable efforts to provide Purchaser with copies of all applications, pleadings, notices, proposed orders and other documents relating to this Agreement or the transactions contemplated hereby, in advance of the proposed filing date so as to permit the Purchaser sufficient time to review and comment on such drafts and, with respect to all provisions that impact the Purchaser or relate to the transactions contemplated by this Agreement, such pleadings and proposed orders shall be in form and substance acceptable to the Purchaser and materially consistent with this Agreement. Sellers shall give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Bidding Procedures Order and the Sale Order.

(b)      On the Petition Date, Sellers shall file with the Bankruptcy Court the Bidding Procedures Motion, together with a substantially final form of this Agreement. Sellers shall promptly serve true and correct copies of all applicable pleadings and notices in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules and any other applicable order of the Bankruptcy Court.

8.4      Employee Matters.

(a)      By no later than the date that is ten (10) Business Days prior to the Closing Date, Purchaser shall, or shall cause its applicable Affiliate or designee to, provide an offer of at-will employment to each Business Employee that Purchaser determines, in its sole and absolute discretion, to offer at will employment, that provides for employment with Purchaser or an Affiliate or designee thereof commencing as of the Closing on terms and conditions consistent with this Section 8.4. Each Business Employee who is offered and accepts such offers of employment with Purchaser based on the initial terms and conditions set by Purchaser and further then actually commences employment with Purchaser will become a "***Transferred Employee***", with such employment to be effective as of 12:01 a.m. on the Closing Date. Sellers shall terminate, or shall cause to be terminated, effective as of immediately prior to 12:01 a.m. on the Closing Date,

the employment of all Transferred Employees. Sellers will reasonably cooperate with any reasonable requests by Purchaser in order to facilitate the offers of employment and delivery of such offers.  Purchaser shall have no obligations, liabilities or responsibilities with respect to any Business Employees who do not become Transferred Employees, and Purchaser shall not be required to maintain any minimum benefit or compensation levels or prevent any change in the employee benefits provided to any Transferred Employees, except as required by Law.  Except as set forth in Section 8.4(b) and Section 8.4(c), Purchaser shall have no liability whatsoever for, and Sellers shall retain and hold Purchaser harmless and indemnify Purchaser with respect to, any and all liabilities (including statutory or contractual severance benefits) with respect to, (i) any compensation or other obligations owing or purported to be owing to any current or former Business Employee or other service provider by any Seller, including any severance (including statutory or contractual severance benefits), separation pay, change of control payments or benefits, retention payments or any other payments or benefits arising in connection with the termination of such employee's employment by or such service provider's services to any Seller or any of their respective Affiliates (whether occurring or arising prior to, upon or after the Closing Date) or (ii) any cause of action under the WARN Act by any past or present Business Employee or other service provider (whether or not a Transferred Employee) in connection with such employee's employment with or such service provider's services to any Seller or any of their respective Affiliates (or any other "employment loss" or similar action identified in the WARN Act).  As soon as reasonably practicable following Purchaser's request, and in any event no later than five (5) Business Days prior to the Closing Date, Sellers shall provide Purchaser with a written schedule of each "employment loss" (as defined in the WARN Act) experienced by any Business Employee or other service provider during the ninety (90) day period prior to the Closing Date (including the location of employment of such employee, and the reason for the employment loss) and such other information as Purchaser may reasonably request to determine whether any actions taken by Sellers prior to, upon or after the Closing Date, or any actions taken by Purchaser upon or after the Closing Date, is reasonably likely to require the delivery of notice or payment in lieu of notice (under the WARN Act or otherwise) to any individuals. Sellers and Purchaser intend that the Transactions shall not constitute a severance or termination of employment of any Business Employee or other service provider prior to or upon the Closing for purposes of any severance or termination benefit plan, program, policy, agreement or arrangement of Sellers, and that Transferred Employees shall have continuous and uninterrupted employment immediately before and immediately after the Closing.

(b)     Sellers and Purchaser hereby agree to follow the standard procedure relating to employment Tax reporting as provided in Section 4 of Rev. Proc. 2004-53, I.R.B. 2004-35. Accordingly, Sellers shall have employment tax reporting responsibilities for the wages and other compensation paid by or on behalf of Sellers to Business Employees and Purchaser shall have employment tax reporting responsibilities for the wages and other compensation paid by or on behalf of Purchaser to Transferred Employees.

(c)     Sellers shall be liable for all workers' compensation, short- and long-term disability, medical, prescription drug, dental, vision, life insurance, accidental death and dismemberment and other welfare benefit claims ("*Welfare Claims*") incurred (i) at any time by the Business Employees and other service providers and their eligible dependents who are not Transferred Employees, or (ii) prior to the Closing Date by the Transferred Employees and their eligible dependents.  With respect to Welfare Claims incurred on or after the Closing Date by the

Transferred Employees and their eligible dependents, Purchaser shall be solely responsible. For these purposes, a Welfare Claim shall be deemed to be incurred: (A) in the case of workers' compensation and short-term disability benefits, at the time of the injury, sickness or other event giving rise to the claim for such benefits; (B) in the case of medical, prescription, drug, dental or vision benefits, at the time the professional services, equipment or prescription drugs covered by the applicable plan are obtained; (C) in the case of life insurance benefits, upon death; and (D) in the case of accidental death and dismemberment benefits, at the time of the accident. In the case of workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained prior to the Closing Date, including injuries sustained on or after the Closing Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Closing Date or arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Sellers' facilities and which are alleged to have been sustained or contracted on or prior to the Closing Date, such workers' compensation claims shall be deemed to be incurred prior to the Closing Date.

(d)     Sellers shall be solely responsible for compliance with the requirements of Section 4980B of the Code and Part 6 of Subtitle I of ERISA, including provision of continuation coverage (within the meaning of COBRA), with respect to all Business Employees and other service providers, and their respective eligible spouses and dependents, for whom a qualifying event (within the meaning of COBRA) occurs at any time on or prior to the Closing Date (including qualifying events that occur in connection with the Transactions). Purchaser shall be responsible for compliance with such health care continuation requirements with respect to all Transferred Employees and their respective eligible spouses and dependents for whom a qualifying event (within the meaning of COBRA) occurs on or after the Closing Date.

(e)     To the extent that a Transferred Employee is entitled under applicable Law to be paid for any vacation days accrued or earned but not yet taken by such Transferred Employee as of the Closing Date, the applicable Sellers shall pay to each Transferred Employee all amounts in respect of vacation days and other paid time off accrued but not taken by such Transferred Employee on or prior to the Closing Date and Purchaser shall have no obligation to honor such accrued vacation days or paid time off after the Closing Date.

(f)     The Parties shall reasonably cooperate in good faith to assign to the Purchaser all Assumed Seller Plans, including all related pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith, in each case effective as of the Closing. If the Purchaser's assumption of one or more Assumed Seller Plans is not practicable, the Parties shall reasonably cooperate in good faith to permit the transfer of the applicable assets of the applicable Seller Plan(s) related to the Transferred Employees to the corresponding Purchaser employee benefit plan(s) in accordance with the intent of this Agreement. The Parties shall cooperate in good faith to enter into such amendments to this Agreement as are necessary to effectuate the actions contemplated pursuant to this Section 8.4(f).

(g)     If requested by Purchaser in a writing delivered to the Sellers following the date hereof and no later than thirty (30) days following the date hereof, Sellers shall adopt resolutions to terminate, effective as of no later than the day before the Closing Date, any Seller Plan that is a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (a "Seller 401(k) Plan"). Sellers shall provide

- 44 -

Purchaser with a copy of the resolutions and any plan amendments, notices and other documents prepared to effectuate the termination of the Seller 401(k) Plans in advance and give Purchaser a reasonable opportunity to comment on such documents in advance (which comments shall be considered in good faith), and prior to the Closing Date, Sellers shall provide Purchaser with the final documentation evidencing that the Seller 401(k) Plans have been terminated effective as of no later than the day before the Closing Date.

(h)      Following the date of this Agreement, Sellers and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by this Section 8.4, including (i) exchanging information and data relating to workers' compensation, employee benefits and employee benefit plan coverages and any information that is reasonably necessary to affect their respective Tax withholding, accounting and reporting obligations under applicable Law, (ii) in obtaining any governmental approvals required hereunder, (iii) in responding to reasonable questions posed by employees, labor unions, employee representatives or any other persons or entities, (iv) providing offers of employment to the Business Employees and (v) transferring to Purchaser, no later than the Closing Date, all employee records, including all current employment eligibility verification form and related records, documents and papers, of the Transferred Employees.

(i)      The Parties shall reasonably cooperate in good faith with respect to any communications to Business Employees and other service providers regarding the Transactions. Sellers will provide Purchaser with a reasonable opportunity to review and comment on any communications intended for the Business Employees and other service providers that it desires or has to send to Business Employees or other service providers prior to the Closing Date. Purchaser will provide Sellers with a reasonable opportunity to review and comment on any communications intended for the Business Employees and other service providers (including regarding its offers of employment) that it desires or has to send to Business Employees and other service providers prior to the Closing Date or to terminate the services of any service provider of the Seller or any of its Affiliates.

(j)      The Parties acknowledge and agree that all provisions contained in this Section 8.4 are included for the sole benefit of the parties to this Agreement, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any employee, former employee or other service provider of Sellers (including the Business Employees), any participant in any employee benefit plan maintained by any of the Parties, or any dependent or beneficiary thereof, or (ii) to continued employment or engagement with any of the Parties or any of their respective Affiliates. Nothing in this Agreement shall affect the right of the Parties or any of their respective Affiliates or the Sponsor to terminate the employment of its employees. Nothing contained in this Section 8.4 is intended to be or shall be considered to be an amendment or adoption of any Seller Plan or any other plan, program, Contract, arrangement or policy of the Parties or any of their respective Affiliates or the Sponsor. In addition, nothing contained in this Section 8.4 shall interfere with the Parties' or any of their respective Affiliates' or the Sponsor's right to amend, modify or terminate any Seller Plan in accordance with its provisions or to terminate the employment or engagement of any employee or other service providers of Sellers (including the Business Employees).

8.5     Publicity. Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no Party shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Parties (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

8.6     Expenses. Except to the extent otherwise specifically provided in this Agreement, each Party shall bear its expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of agents, representatives, counsel and accountants.

8.7     Disclosure Schedules; Further Assurances.

(a)     The Sellers shall expeditiously prepare the Disclosure Schedules and other schedules as needed (other than those to be jointly prepared by the Sellers and the Purchaser) and deliver them to Purchaser for its review and approval within ten (10) Business Days following the date of this Agreement. Without limiting, amending or otherwise modifying any rights of a Party to amend any schedule prior to the Closing as set forth elsewhere in this Agreement,  the Parties shall work together in good faith to finalize the Disclosure Schedules and any other schedules contemplated by this Agreement as soon as reasonably practicable following the date of this Agreement.

(b)     Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any Orders of the Bankruptcy Court, each Seller agrees that it will use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, and cooperate with each other with respect to all things necessary or desirable under applicable Laws to consummate the Transactions. Each Seller agrees to execute and deliver, or cause to be executed and delivered, to Purchaser such other instruments of conveyance and transfer, and to take all such further acts as may be reasonably required to further transfer and assign to Purchaser all of the Purchased Assets, and to vest in Purchaser good and marketable title to each of the Purchased Assets.

(c)     Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any Orders of the Bankruptcy Court, Purchaser agrees that it will use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, and cooperate with each other with respect to all things necessary or desirable under applicable Laws to consummate the Transactions. Each Seller agrees to execute and deliver, or cause to be executed and delivered, to Purchaser such other instruments of conveyance and transfer, and to take all such further acts as may be reasonably required to cause Purchaser to assume the Assumed Liabilities in accordance with this Agreement and as may otherwise be appropriate to carry out the transactions contemplated by this Agreement.

8.8     Governmental Approvals.  Sellers and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or any Transferred Intellectual Property Rights included in the Purchased Assets, in connection with the Transaction, and (b) in taking such actions

or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers. Each Party shall, as promptly as possible, (i) make, or cause or to be made, all filings and submissions required under any Law applicable to such Party or any of its Affiliates; and (ii) use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, Orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement. Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall not be required to take or agree to take any action, including entering into any consent decree, hold, Order or other arrangements, that would (A) require or result in the sale, divestiture or other direct or other disposition of any assets or businesses of Purchaser or any of its Affiliates or (B) limit Purchaser's or any of its Affiliates' freedom of action with respect to, or its or their ability to retain, consolidate or control, the Purchased Assets or any assets or businesses of Purchaser or any of its Affiliates.

8.9     Notice of Certain Matters. Sellers and Purchaser will give prompt written notice to the other Parties of (a) the existence of any fact or circumstance, or the occurrence of any event, of which any Seller has Knowledge or Purchaser has knowledge that would reasonably be likely to cause a condition to a Party's obligations to consummate the transactions contemplated hereby set forth in ARTICLE VII not to be satisfied as of any date, or (b) the receipt of any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; provided, however, that the delivery of any such notice pursuant to this Section 8.9 shall not be deemed to amend or supplement this Agreement and the failure to deliver any such notice shall not constitute a waiver of any right or condition to the consummation of the transactions contemplated hereby by any Party.

8.10    Bulk Transfer Laws. The Parties hereby waive (a) compliance with the provisions of any so-called bulk sales or bulk transfer law of any jurisdiction in connection with the sale of any or all of the Purchased Assets to Purchaser hereunder and (b) all claims related to the non-compliance therewith.

8.11    Insurance.

(a)     To the extent that any of Purchaser's rights to insurance under the Insurance Policies (including those listed as a Retained Asset on Schedule 2.2(c)), or to proceeds therefrom, relating to the damage, destruction, taking or other impairment of any of the Purchased Assets or to liabilities arising from Assumed Liabilities, including insurance for pre-Closing occurrences, direct property loss and business interruption or other time element losses, are not transferable or assignable, then as promptly as practicable following receipt of a written request from Purchaser, Sellers shall use their commercially reasonable efforts to pursue recovery on all such claims; in their own names or as attorney-in-fact (or other representative capacity) for Purchaser, including but not limited to the rights to make, administer and settle claims under any Insurance Policies and to pursue and exhaust applicable coverage (including initiating, prosecuting and resolving litigation), subject to direction and control by Purchaser; provided, however, that Purchaser shall, within five (5) calendar days after receipt of written request therefor, reimburse Sellers and any of their Affiliates for any reasonable, documented out-of-pocket cost or expense incurred in the performance of Sellers' obligations under this Section 8.11.  Purchaser and Sellers shall cooperate in the making and recovery of any such claims for insurance proceeds.  Upon the receipt by Sellers

- 47 -

of any such insurance proceeds or condemnation proceeds relating thereto, Sellers shall as promptly as practicable pay Purchaser such proceeds (but only to the extent those proceeds represent payment or reimbursement by an insurer for any damage, destruction, other impairment or other time element losses or liability, costs, expenses or losses arising from, any Assumed Liabilities actually suffered or incurred by Purchaser, or the costs of repair borne by Purchaser, in each case, in excess of any losses, damages, costs and expenses or other amounts borne by Sellers or any of their Affiliates or the Sponsor in connection with such claims). Additionally, Purchaser shall pay the amount of any deductibles, self-insured retentions, co-insurance or similar expenses (other than increases in premiums) that would otherwise be borne by Sellers or any of their Affiliates or the Sponsor as a result of any such claims.

(b) To the extent any Insurance Policy (including but not limited to those policies listed on Schedule 2.2(c)), provides "occurrence based" liability insurance, Sellers shall request that, prior to the Closing, Purchaser be added as an additional insured, on a primary and noncontributory basis for claims or loss arising from or relating to the Purchased Assets and Assumed Liabilities, under such Insurance Policy for the current policy year and the preceding six (6) policy years and shall take all commercially reasonable steps to ensure that Purchaser is so added. Additionally, to the extent any Insurance Policy (including but not limited to those policies listed on Schedule 2.2(c)), provides "claims made" liability insurance coverage, Sellers shall request and take commercially reasonable steps to ensure that such Insurance Policy continues to provide similar coverage, in all material respects, for pre-Closing wrongful acts, errors or omissions arising from or relating to the Purchased Assets and Assumed Liabilities for a period of six (6) years following the Closing or a different period to which the Sellers' insurance carriers are willing to agree and that is mutually agreed upon by Sellers and Purchaser. Purchaser shall, within five (5) calendar days after receipt of written request therefor, reimburse Sellers and any of their Affiliates and the Sponsor for any documented reasonable out-of-pocket cost or expense incurred in the performance of Sellers' obligations under this Section 8.11

8.12    Change of Name. As soon as practical, and in any event no later than thirty (30) days after the Closing Date, CIS shall amend its certificate of incorporation in the State of Oklahoma to provide for the change of its corporate name to a name other than, and one not similar to, "Cleveland Integrity Services, Inc." (including that such name shall not include the words or "Cleveland" or "Integrity"), and shall effect such name change in each other jurisdiction in which it is authorized to transact business. Sellers shall promptly thereafter deliver to Purchaser true and complete copies of CIS's articles of incorporation, as so amended, certified by the Secretary of State of Oklahoma, and certificates of the Secretary of State or similar office of each other jurisdiction in which it is authorized to transact business, evidencing the good standing of CIS in each such other jurisdiction under its new name. As of and following the Closing Date, CIS shall not conduct business under the name "Cleveland Integrity Services, Inc." or under any name that is confusingly similar thereto or includes the words "Cleveland" or "Integrity."

**ARTICLE IX**
**CLOSING AND TERMINATION**

9.1    Closing. The closing (the "***Closing***") of the Transactions shall be held on or within three (3) Business Days after the conditions set forth in ARTICLE VII are or, if legally permissible, waived (other than those conditions that by their nature are to be satisfied (or validly waived) at

the Closing, but subject to such satisfaction or waiver) (or such other date as the Parties may agree in writing), remotely via the electronic exchange of documents and signature pages or at such other time or place as Purchaser and Sellers may agree.  The date on which the Closing occurs is referred to as the "***Closing Date***."

9.2     <u>Termination</u>. This Agreement and the Transactions may not be terminated prior to the Closing except as follows:

(a)     Upon the mutual written consent of Sellers and Purchaser.

(b)     By Sellers if Sellers are not then in material breach of any provision of this Agreement that would give rise to the failure of a condition set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant, obligation or agreement made by Purchaser pursuant to this Agreement that would, either individually or in the aggregate, if occurring or continuing on the Closing Date, give rise to the failure of any of the conditions specified in <u>Section 7.1</u> or <u>Section 7.3</u> and such breach, inaccuracy or failure to perform is not curable or has not been cured within ten (10) Business Days' written notice thereof to Purchaser.

(c)     By Purchaser if:

(i)     Purchaser is not then in material breach of any provision of this Agreement that would give rise to the failure of a condition set forth in <u>Section 7.1</u> or <u>Section 7.3</u> and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Sellers pursuant to this Agreement that would, either individually or in the aggregate, if occurring or continuing on the Closing Date, give rise to the failure of any of the conditions specified in <u>Section 7.1</u> or <u>Section 7.2</u> and such breach is not curable or has not been cured within ten (10) Business Days' written notice thereof to Sellers;

(ii)     as a result of an Order of the Bankruptcy Court, the Bankruptcy Cases are converted to chapter 7 and a chapter 7 trustee is appointed with respect to Sellers;

(iii)     Sellers (A) withdraw, or seek to withdraw, the Sale Motion, or (B) announce or file a plan or other transaction, or seek to file a plan or other transaction, contemplating reorganization or sale of all or any part of any Seller under the Bankruptcy Code that does not comply with the terms and conditions of this Agreement;

(iv)     Sellers fail to comply with the DIP Order or DIP Facility (subject to any cure or grace periods contained therein) (including, for the avoidance of doubt, if an "Event of Default" thereunder occurs);

(v)     for any reason the Purchaser is unable, pursuant to Bankruptcy Code Section 363(k), to credit bid in payment of all or any portion of the Credit Bid Amount; or

(vi)     (A) Sellers fail to deliver the Disclosure Schedules within ten (10) Business Days of this Agreement in accordance with <u>Section 8.7</u>, or (B) within five (5) Business Days after the Parties have agreed upon the final and complete form of the

- 49 -

Disclosure Schedules if, based on such final and complete Disclosure Schedules, the Purchaser is not satisfied, as determined in its sole discretion, with the diligence of (or its due diligence findings regarding) the Purchased Assets, Assumed Liabilities and/or the Business and operations of the Sellers.

(d)     By either Sellers or Purchaser if:

(i)     the Closing shall not have been consummated on or before the date that is sixty (60) calendar days following the Petition Date (or such later date as mutually agreed by Sellers and Purchaser) (the "***Termination Date***"); provided, that by written notice to Sellers, Purchaser may, in its sole discretion, extend the Termination Date to an alternative later date which is no later than six (6) months following the original Termination Date as contemplated by this Section 9.2(d)(i); provided, further, that neither party shall have the right to terminate this Agreement pursuant to this Section 9.2(d)(i) if the Closing shall not have occurred on or prior to the Termination Date (as it may be extended pursuant to the preceding proviso) due to such Party's failure to perform any covenants or breach of any representation or warranty of such Party set forth in this Agreement;

(ii)     (A) there shall be a Final Order of any nature which is in effect and has the effect of making the Transactions illegal, otherwise restraining or prohibiting consummation of the Transactions or causing any of the Transactions to be rescinded following completion thereof and (B) such Final Order remains in effect for five (5) Business Days after notice thereof has been received by the Sellers and the Purchaser; or

(iii)     (A) there shall be a Law of any nature which is in effect and has the effect of making the Transactions illegal, otherwise restraining or prohibiting consummation of the Transactions or causing any of the Transactions to be rescinded following completion thereof and (B) such Law remains in effect for five (5) Business Days after notice thereof has been received by the Sellers and the Purchaser.

(e)     Automatically, if Sellers close or consummate (or otherwise seeks approval from the Bankruptcy Court of) an Alternative Transaction or the Bankruptcy Court enters an Order approving such Alternative Transaction.

The Party desiring to terminate this Agreement pursuant to this Section 9.2 (other than pursuant to Section 9.2(a) or Section 9.2(e)) shall give notice of such termination to the other Party in accordance with Section 11.2.

### 9.3     Effect of Termination

(a)     Upon the termination of this Agreement in accordance with Section 9.2 hereof, and except as set forth in this Section 9.3, the Parties shall be relieved of any further obligations or liability under this Agreement other than obligations or liabilities for any intentional and willful breaches of this Agreement by such Person occurring prior to such termination.

(b)     Notwithstanding anything to the contrary contained herein, the provisions of this Section 9.3, Section 8.6 and ARTICLE XI shall survive any termination of this Agreement.

# ARTICLE X
# TAX MATTERS

10.1  <u>Cooperation</u>. Sellers agree to furnish or cause to be furnished to Purchaser, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of any Tax returns (including any claim for a Tax refund) by Purchaser, the making of any election relating to Taxes by Purchaser, the determination of liability for Taxes, the preparation for any audit or examination by any Governmental Authority, and the prosecution or defense of any Claim, assessment, suit or other Legal Proceeding relating to any Tax. Sellers and Purchaser shall cooperate with each other in good faith in the conduct of any audit, examination or other Legal Proceeding relating to Taxes involving the Purchased Assets or the Business.

10.2  <u>Transfer Taxes</u>. Subject to the Transfer Taxes Cap, Purchaser shall bear and be responsible for paying any Transfer Taxes, regardless of whether any Tax authority seeks to collect such Taxes from Sellers or Purchaser. Purchaser shall also be responsible for (a) administering the timely payment of such Transfer Taxes directly to the correct Tax authorities, (b) defending or pursuing any proceedings related thereto, and (c) paying any expenses related thereto. Sellers shall give prompt written notice to Purchaser of any proposed adjustment or assessment of any Transfer Taxes. In any proceedings, whether formal or informal, Sellers shall permit Purchaser to participate and control the defense of such proceeding with respect to such Transfer Taxes, and shall take all actions and execute all documents required to allow such participation. The Parties will each timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate (and will each otherwise cooperate) to establish any available exemption (or otherwise reduce) with respect to any such Taxes or fees. The Parties shall cooperate in good faith to minimize, to the fullest extent possible under applicable Law, the amount of any such Transfer Taxes.

10.3  <u>Provision of Tax Forms</u>. Sellers agree to provide, before the Closing Date, any forms or other documentation reasonably requested by Purchaser to reduce or eliminate any withholding Taxes that could be imposed on any of the transactions contemplated by this Agreement.

10.4  <u>Property Taxes</u>. Notwithstanding anything contained in <u>Section 3.2(c)</u> to the contrary, all Property Taxes for a Tax period which includes (but does not end on) the Closing Date (collectively, the "***Apportioned Obligations***") shall be apportioned between the Sellers, on the one hand, and Purchaser, on the other hand, based on the number of days of such Tax period included in the Pre-Closing Tax Period and the number of days of such Tax period included in the Post-Closing Tax Period. Sellers shall be liable for the proportionate amount of the Apportioned Obligations that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of the Apportioned Obligations that is attributable to the Post-Closing Tax Period. For the avoidance of doubt, any Tax refund of any of the Sellers that is attributable to the Apportioned Obligations shall be promptly paid to Purchaser.

10.5  <u>Apportionment</u>. Apportioned Obligations shall be timely paid, and all applicable filings, reports and Tax Returns shall be filed, as provided by applicable Law. The paying Party shall be entitled to reimbursement from the non-paying Party for Apportioned Obligations for

which the non-paying Party is liable pursuant to this <u>Section 10.5</u>. Upon payment of any such Apportioned Obligation, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under this <u>Section 10.5</u>, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying Party shall make such reimbursement promptly, but in no event later than ten (10) days after the presentation of such statement. Any payment not made within such time shall bear interest at the rate per annum equal to four percent (4%).

**ARTICLE XI**
**<u>GENERAL PROVISIONS</u>**

     11.1    <u>Bankruptcy Court Approval</u>. This Agreement and the transactions contemplated hereby are contingent upon the Bankruptcy Court's entry of the Bid Procedures Order and of the Sale Order.

     11.2    <u>Notices</u>. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when transmitted via electronic mail to the e-mail address set out below if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), (c) the day following the day (except if not a Business Day then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service (with confirmation) to the respective Parties at the applicable address set forth below, unless another address has been previously specified in writing, or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid,  to the respective Parties at  the applicable address set forth below, unless another address has been previously specified in writing:

     If to Purchaser, to:

     CIS Purchaser, LLC
     c/o Owl Rock Capital Corporation
     399 Park Ave 38th Floor
     New York, NY 10022
     Attn: Brian Finkelstein
          Mark Nixdorf
     E-mail: brian.finkelstein@blueowl.com
           mark.nixdorf@blueowl.com
     Phone: 212-419-3000

     With a copy to:

     Proskauer Rose LLP
     One International Place
     Boston, MA 02110
     Attention: David M. Hillman, Esq.; Steven M. Peck, Esq.; Kristian M. Herrmann, Esq.
     E-mail: dhillman@proskauer.com; speck@proskauer.com; kherrmann@proskauer.com

**- 52 -**

If to Sellers, to:

Cleveland Integrity Services, Inc.
CIS Treasury, LLC
370690 Old Highway 64
Cleveland, OK 74020
Attn: Matt Kesner
E-mail: Matt.kesner@clevelandintegrity.com
Phone: 918-358-5735

With a copy to:

Gray Reed & McGraw LLP
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Attn: Jason Brookner, Aaron Kaufman, Lydia Webb; Brock Niezgoda
E-mail: jbrookner@grayreed.com; akaufman@grayreed.com; lwebb@grayreed.com;
bniezgoda@grayreed.com

11.3  Survival of Representations, Warranties, Covenants and Agreements. All representations and warranties made by each Party in this Agreement shall terminate on the Closing Date and not survive the Closing upon, but subject to, the purchase of the Purchased Assets by Purchaser, and neither Sellers, Purchaser nor any of their respective Affiliates nor the Sponsor shall have any liability after the Closing Date for any breach of any representation or warranty made by such Party in this Agreement. Except as specifically set forth otherwise in the Agreement, all covenants, obligations and agreements of Sellers and/or Purchaser shall lapse at, and be of no further force and effect following, the Closing.

11.4  Binding Effect. Except as may be otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee, responsible Person, estate administrator, representative or similar Person appointed for or in connection with the Bankruptcy Case or in any subsequent case under the Bankruptcy Code in which any Seller is a debtor. Except as otherwise provided in this Agreement, nothing in this Agreement is intended or shall be construed to confer on any Person other than the Parties any rights or benefits hereunder.

11.5  Headings. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

11.6  Exhibits and Schedules. The Exhibits and Schedules referred to in this Agreement shall be deemed to be an integral part of this Agreement.

11.7  Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same document. Any signature delivered by a Party via facsimile or delivered electronically in PDF format shall be deemed to be an original signature hereto.

- 53 -

11.8    Governing Law/Jurisdiction. Except to the extent inconsistent with the Bankruptcy Code (in which case the Bankruptcy Code shall govern), this Agreement and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement or the Transaction Documents or the negotiation, execution or performance of this Agreement or the Transaction Documents (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement as an inducement to enter this Agreement) shall be governed by and construed under New York law, without regard to conflict of laws principles. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement or the Transaction Documents shall be brought against any of the Parties exclusively in the Bankruptcy Court, or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, in the courts of the State of New York, or, if it has or can acquire jurisdiction, in the United States District Court located in Southern District of New York, and each of the Parties consent to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waive any objection to venue in those courts. Process in any action or proceeding referred to in the preceding sentence may be served on any Party anywhere it the world.

11.9    WAIVER OF JURY TRIAL. EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY ACTION TO WHICH THEY ARE PARTIES INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

11.10    Waivers. Compliance with the provision of this Agreement may be waived only by a written instrument specifically referring to this Agreement and signed by the Party waiving compliance.  No course of dealing, nor any failure or delay in exercising any right, shall be construed as a waiver, and no single or partial exercise of a right shall preclude any other or further exercise of that or any other right.

11.11    Pronouns. The use of a particular pronoun herein shall not be restrictive as to gender or number but shall be interpreted in all cases as the context may require.

11.12    Modification. No supplement, modification or amendment of this Agreement shall be binding unless made in a written instrument which is signed by all of the Parties and which specifically refers to this Agreement.

11.13    Successors/Assignment. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. Purchaser may assign any and all of its rights, title and interest in this Agreement to its designee, affiliate or assignee at its sole election.  No assignment by any Seller of this Agreement or any right or obligation hereunder may be made without the prior written consent of the Purchaser, and any assignment attempted without such consent will be void *ab initio*.

11.14    Entire Agreement. This Agreement, including the Schedules and Exhibits hereto, and the other agreements and documents referred to in this Agreement or delivered hereunder are the exclusive statement of the agreement among the Parties concerning the subject matter hereof. All negotiations among the Parties are merged into this Agreement, and there are no

representations, warranties, covenants, understandings or agreements, oral or otherwise, in relation thereto among the Parties other than those incorporated herein and to be delivered hereunder.

11.15    <u>Severability</u>. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Laws effective during the term hereof, then to the maximum extent permitted by Law, the legality, validity, and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

11.16    <u>No Third Party Beneficiaries</u>. No provision of this Agreement is intended to confer upon any Person other than the Parties any rights or remedies hereunder; <u>provided</u>, that (a) each of the Seller Released Parties shall be a third-party beneficiary of <u>Section 11.18</u> with full rights of enforcement as though each such Seller Released Party was a signatory to this Agreement and (b) each of the Purchaser Released Parties shall be a third-party beneficiary of <u>Section 11.19</u>, with full rights of enforcement as though each such Purchaser Released Party was a signatory to this Agreement.

11.17    <u>Non-Recourse</u>. All claims or causes of action (whether in contract or in tort, at law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement or the Transaction Documents may be made only against (and are expressly limited to) the Persons that are expressly identified as parties hereto or thereto (each a "***Contracting Party***"). In no event shall any Contracting Party have any shared or vicarious liability for the actions or omissions of any other Person. Except as otherwise set forth in this Agreement, no Person who is not a Contracting Party, including any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney or representative of, and any financial advisor or lender to, any of the foregoing, including the Sponsor ("***Non-Party Affiliates***"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Transaction Documents or based on, in respect of, or by reason of this Agreement or the Transaction Documents or their negotiation, execution, performance or breach; and, to the maximum extent permitted by Law, each Contracting Party waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates.

11.18    <u>Release of Sellers</u>.

(a)    As a material inducement to the Sellers' willingness to enter into and perform this Agreement and to sell the Purchased Assets and the Assumed Liabilities for the consideration to be paid or provided to the Sellers in connection with such acquisition, the Purchaser, on behalf of itself and its assigns, heirs, beneficiaries, equityholders, creditors and each of its and their respective Affiliates and representatives (collectively, the "***Seller Releasing Parties***"), hereby releases and forever discharges each of the Sellers and their respective direct and indirect equityholders (and with respect to such equityholders, in their respective capacities, to the extent applicable, as equityholders, directors, officers, employees, independent contractors and/or service providers of the Business), including the Sponsor, and each of Seller's individual, joint or mutual, past, present and future representatives, Affiliates, controlling persons and subsidiaries and the successors and assigns of the foregoing (collectively, the "***Seller Released Parties***") for

any of the Seller Released Parties' actions or omissions, including the Sponsor Claims prior to the Closing in relation to or arising from the pre-Closing operations of the Business (collectively, the "***Purchaser Released Causes of Action***"), other than (i) in the case of fraud or criminal misconduct, (ii) claims under this Agreement and the other Transaction Documents and the documents implementing the Related Party Transactions, or (iii) any obligations owing by the Sellers as of the Closing under the Pre-Petition Facility (other than such obligations constituting the Credit Bid Amount). Each Seller Releasing Party hereby represents to the Seller Released Parties that such Seller Releasing Party (A) has not assigned any Purchaser Released Causes of Action or possible Purchaser Released Causes of Action against any Seller Released Party, (B) fully intends to release all Purchaser Released Causes of Action against the Seller Released Parties, including unknown and contingent Purchaser Released Causes of Action (other than those specifically reserved above), and (C) has consulted with counsel with respect to the execution and delivery of this general release and has been fully apprised of the consequences hereof. Furthermore, each Seller Releasing Party further agrees not to institute any Legal Proceeding against any Seller Released Party with respect to the released Purchaser Released Causes of Action. Each of the Seller Released Parties shall be express third-party beneficiaries of this Section 11.18.

(b) The Purchaser hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any Legal Proceeding of any kind against any Seller Released Parties, based upon any matter purported to be released hereby.

(c) In the event that any provision of this Section 11.18 is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Section 11.18 will remain in full force and effect. Any provision of this Section 11.18 held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

11.19    Release of Purchaser.

(a) As a material inducement to the Purchaser's willingness to enter into and perform this Agreement and to acquire the Purchased Assets and assume the Assumed Liabilities for the consideration to be paid or provided to the Sellers in connection with such acquisition, each Seller, on behalf of itself and its assigns, heirs, beneficiaries, equityholders, creditors, and each of its and their respective Affiliates and representatives (collectively, the "***Purchaser Releasing Parties***"), hereby releases and forever discharges the (i) Purchaser, (ii) the Agents and Lenders (as defined in that certain Credit Agreement, dated as of September 8, 2016, by and among CIS, as guarantor, the borrower and other guarantors party thereto, the other loan parties party thereto, the banks and financial institutions or entities from time to time party thereto and Owl Rock, as administrative agent), and (iii) the DIP Agent and DIP Lenders (as defined in the DIP Orders), and each of their individual, joint or mutual, past, present and future representatives, Affiliates, equityholders, controlling persons, subsidiaries, successors and assigns (collectively, the "***Purchaser Released Parties***") from any and all claims, demands, proceedings, causes of action, Orders, obligations, Contracts, agreements, debts and liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which each Purchaser Releasing Party now has, have ever had or may hereafter have against the respective Purchaser Released

**- 56 -**

Parties arising contemporaneously with or prior to the Closing or on account of or arising out of any matter, cause or event occurring contemporaneously with or prior to the Closing, that relate to or arise out of the Purchased Assets, the Assumed Liabilities or the Business (for the purposes of this Section 11.19, "**_Seller Released Causes of Action_**"); provided, however, that nothing contained herein shall operate to release any obligation of the Purchaser arising under this Agreement or any of the other Transaction Documents or the documents implementing the Related Party Transactions. Each Purchaser Releasing Party hereby represents to the Purchaser Released Parties that such Purchaser Releasing Party (A) has not assigned any Seller Released Causes of Action or possible Seller Released Causes of Action against any Purchaser Released Party, (B) fully intends to release all Seller Released Causes of Action against the Purchaser Released Parties, including unknown and contingent Seller Released Causes of Action (other than those specifically reserved above), and (C) has consulted with counsel with respect to the execution and delivery of this general release and has been fully apprised of the consequences hereof. Furthermore, each Purchaser Releasing Party further agrees not to institute any Legal Proceeding against any Purchaser Released Party with respect to the released Seller Released Causes of Action. Each of the Purchaser Released Parties shall be express third party beneficiaries of this Section 11.19.

(b)     Each Seller, on behalf of itself and each other Purchaser Releasing Party, hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any Legal Proceeding of any kind against the Purchaser Released Parties, based upon any matter purported to be released hereby.

(c)     Without in any way limiting any of the rights and remedies otherwise available to the Purchaser Released Parties, each Seller (on a joint and several basis) shall indemnify, defend and hold harmless (and reimburse) each Purchaser Released Party from and against all damages and liabilities whether or not involving third-party claims, arising, directly or indirectly, from or in connection with (i) the assertion by or on behalf of any Seller (or any other Purchaser Releasing Party) of any claim or other matter purported to be released pursuant to this Section 11.19 and (ii) the assertion by any third party of any claim or demand against the Purchaser Released Parties which claim or demand arises, directly or indirectly, from, or in connection with, any assertion by or on behalf of such Seller (or any other Purchaser Releasing Party) against such third party of any claims or other matters purported to be released pursuant to this Section 11.19.

(d)     In the event that any provision of this Section 11.19 is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Section 11.19 will remain in full force and effect. Any provision of this Section 11.19 held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

11.20   Negotiated Agreement. Each Seller and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any Party because such Party or its representatives drafted such provision.

11.21   Specific Performance. The Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms

or was otherwise breached or the Closing was not consummated, and that money damages would not be an adequate remedy, even if available. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions, or any other appropriate form of specific performance or equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (including the Parties' obligations to consummate the Closing) in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law, or in equity, or otherwise. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to post any bond or other security in connection with any such Order.

11.22   <u>Use of Corporate Name or Trademark</u>. After the Closing, the Sellers acknowledge that no rights in the name "CIS", "Cleveland Integrity Services", or any trademark, service mark or trade name included within the Intellectual Property constituting Purchased Assets, or any derivative or variation thereof or any name similar thereto will be retained by any of the Sellers or their respective Affiliates and the Sellers shall, and shall cause their Affiliates, to file such documents with the applicable secretaries of state, to seek an order from the Bankruptcy Court in form and substance acceptable to the Purchaser changing the case caption to reflect the Sellers' new names, and take all other necessary actions to, as promptly as practicable following the Closing (but in any event by the date that is thirty (30) days after the Closing), change the name of the Sellers and their respective Affiliates so that each such Person no longer uses "CIS", "Cleveland Integrity Services", or any trademark, service mark or trade name included within the Intellectual Property constituting Purchased Assets in its name (or in any "doing-business-as" or similar trade name).

**[SIGNATURE PAGES FOLLOW]**

- 58 -

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first written above.

**PURCHASER:**

CIS PURCHASER, LLC

By:

Name: Brian Finkelstein
Title: Authorized Signatory

[*Signature Page to Asset Purchase Agreement*]

**SELLERS:**

CLEVELAND INTEGRITY SERVICES, INC.

By: _____

Name: Matt Kesner

Title:   President & Chief Operating Officer

CIS TREASURY, LLC

By: _____

Name: Matt Kesner

Title:   President & Chief Operating Officer

*[Signature Page to Asset Purchase Agreement]*